Thomas F. DORR and Beverly A. Dorr, Plaintiffs-
Appellants-Cross-Respondents,

v.

SACRED HEART HOSPITAL, Defendant-Respondent-
Cross-Appellant.†

Court of Appeals

*No. 98–1772. Oral argument March 30, 1999.—Decided May
25, 1999.*

(Also reported in 597 N.W.2d 462.)

†Petition to review dismissed.

On behalf of the plaintiffs-appellants-cross-respondents, there were briefs and oral argument by *John P. Richie* of *Misfeldt, Stark, Richie & Wickstrom*, Eau Claire.

On behalf of the defendant-respondent-cross appellant, the cause was submitted on the briefs of *Ralph V. Topinka* and *Elizabeth A. Hartman* of *Quarles & Brady LLP*, Madison, and *George W. Hallstein* of *Wilcox, Wilcox, Enright, Hallstein, McMahon & Adler LLC*, Eau Claire. There was oral argument by *Ralph V. Topinka*.

A nonparty brief was filed by *Timothy A. Hartin* of Madison for Wisconsin Health and Hospital Ass'n, Inc.

Before Cane, C.J., Myse, P.J., and Hoover, J.

MYSE, P.J. Thomas and Beverly Dorr appeal the portion of the trial court's summary judgment dismissing their claims against Sacred Heart Hospital for: (1) false representation contrary to § 100.18, STATS.; (2) unfair debt collection practice contrary to § 427.104, STATS.; (3) breach of contract; (4) racketeering contrary to §§ 946.82(4) and 946.83, STATS.; and (5) punitive damages. Sacred Heart cross-appeals the portion of the summary judgment granted in the Dorrs' favor on their claims for conversion and tortious interference with their Group Health HMO contract. The trial court awarded the Dorrs $27,051.65 on these claims.

This case arose as a result of the hospital filing a hospital lien pursuant to § 779.80, STATS., on liability insurance settlement proceeds due Beverly, who sustained injuries in an automobile accident. The Dorrs had medical insurance coverage through an HMO that had contracted with the hospital to render medical services to its subscribers at an agreed upon rate;

nevertheless, the hospital pursued payment by filing a lien on the insurance proceeds due the Dorrs. The Dorrs contend that Sacred Heart's filing of the lien violated the Dorrs' right to be held harmless against the hospital's collection efforts under the HMO enrollee immunity provision of § 609.91, STATS., and under the "Hold Harmless" provision of the Provider Agreement between Sacred Heart and Group Health Cooperative of Eau Claire, Inc. (Group Health), the Dorrs' HMO. The Dorrs' causes of action flow from their allegation that Sacred Heart improperly filed the hospital lien.

In its cross-appeal, Sacred Heart contends that the trial court erred when it granted judgment in the Dorrs' favor on the conversion and tortious interference claims because § 779.80, STATS., creates a right to attach the insurance proceeds irrespective of the Dorrs' immunity from recourse under § 609.91, STATS., and the Provider Agreement's "Hold Harmless" provision.

We conclude that the statutory HMO enrollee immunity provisions of § 609.91, STATS., and the contractual HMO enrollee hold harmless provision of the Provider Agreement between the hospital and Group Health operate to exclude a debt owed the hospital by the Dorrs. Because a lien requires an underlying debt, Sacred Heart was without legal authority to utilize § 779.80, STATS., to seek payment for the medical services rendered to Beverly Dorr. For the reasons stated below, we further conclude that the trial court erred when it dismissed the Dorrs' claims for: false representation, unfair debt collection practice, breach of contract, racketeering, and punitive damages. Accordingly, we reverse the court's judgment of dismissal and remand those claims for trial. Finally, we conclude the trial court properly granted judgment in the Dorrs' favor on the conversion and tortious interference with

a contract claims and therefore affirm the trial court's judgment on those claims.

## BACKGROUND

Beverly Dorr, wife of Thomas Dorr, was injured in an auto accident caused by Deborah Goldsmith, the driver of a car that struck the Dorrs' car. Beverly sustained serious injuries and was taken to Sacred Heart Hospital where she was admitted as an emergency patient for a surgical stay for a splenectomy. Upon admission, the Dorrs gave the hospital their health insurance information, indicating that they had full coverage with Group Health. This information was entered into the hospital's financial data sheets. The Dorrs' Group Health insurance policy provided coverage for all of Beverly's surgical and medical expenses. Thus, all of the expenses for the surgical stay were covered under the Dorrs' health insurance with Group Health. Shortly after her discharge, Beverly developed pneumonia and was readmitted to Sacred Heart for what was classified as a medical stay. Again, all of the expenses for the medical stay were covered under the Group Health policy. The total cost for both hospitalizations was $27,051.65, but because of the agreed rate charged to Group Health subscribers, the hospital could only bill Group Health $17,618.

Goldsmith, the driver of the other car, was insured by Wisconsin American Mutual Insurance Company (WAMIC) for auto liability with a $50,000 per person liability limit. The Dorrs eventually settled their personal injury claims against Goldsmith and WAMIC for the full liability limit. The Dorrs signed a release relinquishing further claims against Goldsmith and WAMIC.

Sacred Heart Hospital filed a hospital lien against Beverly's personal injury claim for the sum of $27,051.65 pursuant to its practice and interpretation of § 779.80, STATS., which authorizes hospitals to file liens for services rendered to any person sustaining injuries as the result of a tortfeasor's negligence.[1] The lien names Thomas Dorr and Deborah Goldsmith, along with their respective insurers, as persons alleged to be responsible parties. The lien satisfaction identifies Beverly Dorr as the party against whom the lien was filed.

At the time of Beverly's hospitalization, Sacred Heart Hospital had negotiated a Provider Agreement with Group Health whereby Group Health subscribers would be admitted to Sacred Heart to receive the hospitalization services Group Health offered to subscribers in its insuring certificate. In exchange, Sacred Heart agreed that, rather than billing on an itemized cost basis, Group Health would pay and Sacred Heart would accept payment at a reduced "per diem" rate. Under the per diem arrangement, Group Health paid a flat fee of $674 per day for a hospitalization due to medical illness and $1,075 per day for a hospitalization due to a surgical stay. Sacred Heart agreed to accept the per diem rates as full payment for the medical services provided. These per diem rates generally allowed the hospital to recover its costs plus generate a profit.

The Provider Agreement also contains a "Hold Harmless" provision, whereby Sacred Heart would not bill or hold Group Health subscribers liable for any hospital expenses covered by the subscriber's Group Health insurance contract. Under the hold harmless

---

[1] The hospital lien and satisfaction actually show an amount of $27,052.65.

provision, Sacred Heart also agreed not to exercise its right under § 609.92, STATS., to elect to be exempt from the HMO enrollee immunity protections § 609.91, STATS., accords.

Group Health's insurance certificate to its members indicates that patients would be provided "full benefit" for hospitalizations at no cost or expense other than payment of premiums. Group Health can only make payment to Sacred Heart after Sacred Heart submits a proper bill.

Sacred Heart did not bill Group Health for Beverly's hospital expenses; instead, it filed a lien pursuant to § 779.80, STATS., against the Dorrs' liability insurance settlement proceeds. This action arises out of that hospital lien, which claims an amount due of $27,051.65, a combined total for the two hospitalizations. When they learned of the lien, the Dorrs and Group Health notified Sacred Heart on several occasions that they believed the Dorrs were immune from collection under § 609.91, STATS., and requested the lien be dropped. Sacred Heart refused to drop the lien. Sacred Heart wrote to WAMIC requesting that $27,051.65 of the Dorr's insurance settlement be sent directly to Sacred Heart to satisfy the hospital lien. When WAMIC paid its liability limits in settlement of the Dorrs' claims, it sent $27,051.65 directly to Sacred Heart and the remaining $22,948.35 to the Dorrs.

## STANDARD OF REVIEW

We review a trial court's decision on summary judgment de novo, as a question of law. *M&I First Nat'l Bank v. Episcopal Homes Mgmt.*, 195 Wis. 2d 485, 496–97, 536 N.W.2d 175, 182 (Ct. App. 1995). In making this determination, we apply the same

methodology as the trial court. *Id.* at 496, 536 N.W.2d at 182. Because that methodology has been set forth numerous times, we do not repeat it here except to emphasize that if a genuine dispute of material fact exists or if the evidence presented is subject to conflicting inferences or factual interpretations, summary judgment must be denied. *Grams v. Boss*, 97 Wis. 2d 332, 338, 294 N.W.2d 473, 476 (1980). Inferences drawn from facts contained in the supporting materials are viewed in the light most favorable to the nonmoving party. *Kraemer Bros. v. United States Fire Ins. Co.*, 89 Wis. 2d 555, 567, 278 N.W.2d 857, 862 (1979). Furthermore, questions of law are appropriate for summary judgment. *Jones v. Sears Roebuck & Co.*, 80 Wis. 2d 321, 327, 259 N.W.2d 70, 72 (1977).

## ANALYSIS

Although each of the Dorrs' claims against the hospital must be examined, the parties agree that resolution of these contentions rests upon a preliminary determination. Can a hospital file a § 779.80, STATS., lien, claiming the full itemized cost of the medical services, against liability insurance settlement proceeds due an HMO insured patient? We must determine whether the immunity provision of § 609.91, STATS., or the hold harmless provision of the Provider Agreement affect the hospital's ability to file a lien under § 779.80. We conclude that when § 609.91's immunity provisions apply or when a contract between an HMO and hospital contains a hold harmless provision, no hospital lien can be filed against an HMO patient's property because the HMO patient is not indebted to the hospital for the medical services provided.

## I. Whether Sacred Heart May File a Hospital Lien Irrespective of § 609.91, Stats., and the Provider Agreement

The hospital contends that it is not required to seek the reduced per diem reimbursement under its contract with the HMO when it can receive the full value of the services rendered by filing a hospital lien against a patient's insurance settlement proceeds for damages received as a result of a tortfeasor's negligence. The hospital contends that § 779.80, Stats., creates a right to attach these proceeds with the full value of the services rendered notwithstanding the Dorrs' immunity from recourse by the hospital under § 609.91, Stats., and the Provider Agreement's "hold harmless" provision and the provision assuring Group Health's payment for the medical services under the contractually agreed per diem rate. We are not persuaded.

We begin our analysis by considering whether § 779.80, Stats., permits the filing of a lien without an underlying debt. Sacred Heart contends that it may assert its lien rights under § 779.80 because the hospital lien statute does not require the existence of a debt. We disagree.

■

Whether § 779.80, Stats., requires the existence of an underlying debt is a question of statutory interpretation. The interpretation of a statute is a question of law we decide independently. *Minuteman, Inc. v. Alexander*, 147 Wis. 2d 842, 853, 434 N.W.2d 773, 778 (1989). The goal of statutory construction is to ascertain the legislature's intent. *Rolo v. Goers*, 174 Wis. 2d 709, 715, 497 N.W.2d 724, 726 (1993). We look first to the statute's language, *see In re J.A.L.*, 162 Wis. 2d 940, 962, 471 N.W.2d 493, 502 (1991), and if the language is

clear and unambiguous, the statute's terms will be applied in accordance with the statute's plain language. *Id.* Only if there is ambiguity do we resort to rules of construction, including resort to legislative history, in an effort to determine legislative intent. *Id.*

Section 779.80, STATS., provides in relevant part:

**(1)** Every corporation, association or other organization operating as a charitable institution and maintaining a hospital in this state shall have a lien for services rendered, by way of treatment, care or maintenance, to any person who has sustained personal injuries as a result of the negligence, wrongful act or any tort of any other person.

**(2)** Such lien shall attach to any and all rights of action, suits, claims, demands and upon any judgment, award or determination, and upon the proceeds of any settlement which such injured person, or legal representatives might have against any such other person for damages on account of such injuries, for the amount of the reasonable and necessary charges of such hospital.

■■

We acknowledge that § 779.80, STATS., does not refer to a debt. Under the statute, the lien is created by virtue of the hospital rendering medical services to a patient. Nonetheless, we reject the hospital's contention that this statute creates lien rights in the absence of an unpaid debt underlying the lien. A lien is defined as a "Qualified right of property which a creditor has in or over specific property *of his debtor* . . . ." BLACK'S LAW DICTIONARY 832 (5th Ed. 1979) (emphasis added). Because a lien is a right to encumber property until a debt is paid, it presupposes the existence of a debt.

*State v. Berndt*, 161 Wis. 2d 116, 125, 467 N.W.2d 205, 208 (Ct. App. 1991).

We conclude that the essence of any lien statute, including § 779.80, STATS., requires the existence of an obligation due the lienholder from the person whose property to which the lien attaches. Nowhere in the Wisconsin statutes does the legislature reflect an intent to allow a lien to be impressed on an individual's property when that person owes no obligation to the lien claimant. Indeed, the creation of lien rights is an attempt to secure payment for debts due the lienholder and to facilitate the satisfaction of that obligation. To suggest that a lien can exist independent of a debt turns the purpose and provisions of a lien statute on its head. Lien statutes are designed to facilitate debt collection, not to encumber property when the property holder owes no obligation to the lienholder. Contrary to Sacred Heart's contention, we conclude that the plain language of § 779.80 requires an underlying debt to support the lien.

Furthermore, we conclude that the plain language of § 779.80, STATS., contemplates that the underlying debt to which the lien attaches is an obligation owed by the person receiving medical services from the hospital. Subsection (1) authorizes the hospital to attach a lien "for services rendered . . . *to any person who has sustained personal injuries* . . . ." Section 779.80(1), STATS., (emphasis added). Subsection (2) states in relevant part: "Such lien shall attach to any and all rights of action, suits, claims, demands and upon any judgment, award or determination, and upon the proceeds of any settlement *which such injured person, . . . might have* . . . for the amount of the reasonable and necessary charges of such hospital." Section 779.80(2), STATS., (emphasis added). This language describes the

438

lien as attaching to designated rights belonging to the injured patient because a lien presupposes a debt. If the lien attaches to the injured patient's rights, the patient must be the obligor of the underlying debt. Consequently, we conclude that § 779.80 not only contemplates the existence of a debt underlying the lien but also that the debt's obligor is the injured person who received the medical services from the hospital.

To further support our conclusion, we note that Sacred Heart's lien recites that Thomas Dorr is liable for the amount claimed by the hospital. The lien's specific language states: "The names and addresses of the persons alleged to be liable for such damages are as follows . . . ." The lien then lists Thomas Dorr. The lien also lists Horace Mann Insurance and identifies Beverly Dorr as the policyholder. The very document the hospital filed, therefore, asserts the existence of a debt and the Dorrs' obligation on the debt even though the hospital acknowledges that the Dorrs have no legal obligation to pay for the services it rendered.

In addition, upon receipt of the insurance proceeds, the hospital filed a lien satisfaction. The lien satisfaction further reflects the existence of a debt and identifies the Dorrs as the obligors of the debt that was paid. The lien satisfaction reads: "Sacred Heart Hospital . . . by and under a certain Hospital Lien filed . . . by and under which such claim for a lien *against* Beverly A. Dorr . . . for $27,052.65 . . . do so hereby acknowledge payment and satisfaction of and do so hereby release all rights of action, claims, demands and Judgements, said lien and claim thereunder." (Emphasis added.)

Having concluded that § 779.80, STATS., contemplates the existence of an underlying debt owed by the injured patient who received medical services from the hospital, we next consider whether a debt exists when

439

the patient is an HMO subscriber immune from recourse under § 609.91, STATS., or a contractual hold harmless provision. To make this determination, we first consider the effect of § 609.91 and then the effect of the Provider Agreement's "hold harmless" provision on the hospital's lien rights.

The application of § 609.91, STATS., to § 779.80, STATS., involves a question of statutory interpretation which is a question of law we review de novo. *State ex rel. Sielen v. Milwaukee County*, 176 Wis. 2d 101, 106, 499 N.W.2d 657, 659 (1993). Conflicts between statutes are disfavored and will be held not to exist if the statutes may be otherwise construed. *Ahrens-Cadillac Oldsmobile, Inc. v. Belongia*, 151 Wis. 2d 763, 766, 445 N.W.2d 744, 745 (Ct. App. 1989). The court's duty is to attempt to harmonize statutes, if possible, and read them together in a way that will give each full force and effect. *City of Milwaukee v. Kilgore*, 193 Wis. 2d 168, 184, 532 N.W.2d 690, 697–98 (1995). The court will not construe statutes to work absurd or unreasonable results. *Cross v. Hebl*, 46 Wis. 2d 356, 361, 174 N.W.2d 737, 739 (1970).

Section 779.80, STATS., and § 609.91, STATS., create separate rights. Section 779.80 authorizes a hospital to file a lien to recover fees for medical services rendered an injured person from recoveries the person is due from a tortfeasor. Section 609.91 immunizes an HMO enrollee from personal liability for the costs of covered health care received.

Section 609.91, STATS., states in relevant part:

**(1)** IMMUNITY OF ENROLLEES AND POLICYHOLDERS. Except as provided in sub. (1m), an enrollee or policyholder of a health maintenance

440

organization insurer is not liable for health care costs that are incurred on or after January 1, 1990, and that are covered under a policy or certificate issued by the health maintenance organization insurer, if any of the following applies:

. . . .

(b) The health care is provided by a provider who is not subject to par. (a) or (am) and who does not elect to be exempt from this paragraph under s. 609.92, and the health care satisfies any of the following:

1. Is provided by a hospital . . . .

. . . .

(2) PROHIBITED RECOVERY ATTEMPTS. No person may bill, charge, collect a deposit from, seek remuneration or compensation from, file or threaten to file with a credit reporting agency or have any recourse against an enrollee, policyholder or insured, or any person acting on their behalf, for health care costs for which the enrollee, policyholder or insured, or person acting on their behalf, is not liable under sub. (1) or (1m).

Sacred Heart concedes that the Dorrs do not owe a debt because under § 609.91, STATS., they are immune from collection.[2] With this concession, the hospital is precluded from making a claim for payment against

---

[2] It is undisputed that the hospital did not opt out of § 609.91's statutory scheme pursuant to § 609.92(1), STATS., which states in relevant part: "[A] hospital . . . or other provider described in § 609.91(1)(b) may elect to be exempt from § 609.91(1)(b) for the purpose of recovering health care costs arising from health care provided by the hospital . . . if the

441

the Dorrs who were fully insured by their HMO. This statute's effect negates an HMO subscriber's obligation to pay the hospital for medical services rendered. Consequently, the HMO subscriber is not the underlying debtor because the patient has no liability for expenses the HMO policy covers. When a hospital is subject to the prohibition of § 609.91, its only recourse for payment lies with the HMO. Therefore, we conclude that because § 609.91 negates the existence of a debt the Dorrs owe the hospital and because the filing of the lien violates the statute's prohibition against seeking recourse against Group Health's subscribers, the hospital is precluded under § 609.91 from asserting its lien rights under § 779.80, STATS.

Sacred Heart contends, however, that by attaching its lien rights to the insurance proceeds, the hospital is not violating § 609.91, STATS.'s prohibition against seeking recourse against the Dorrs because it is instead seeking recourse against the tortfeasor. The plain language of § 779.80, STATS., however, does not authorize the hospital to pursue collection from the tortfeasor; it only authorizes the hospital to attach a lien on insurance proceeds due to the injured party from the tortfeasor's insurer. Furthermore, Sacred Heart's contention is belied by the language of its lien and lien satisfaction identifying the Dorrs as the obligated parties to the lien.

We next consider the effect of the Provider Agreement negotiated between Group Health and the hospital on the hospital's lien rights under § 779.80, STATS. Section 2.09 of the Provider Agreement, entitled "Hold Harmless," provides in relevant part:

conditions under sub. (2) or (3), whichever is applicable, are satisfied."

(1) Payment by Cooperative under this Agreement shall constitute payment in full for Covered Services rendered to Members. In no event, including but not limited to nonpayment by Cooperative, insolvency of Cooperative, or breach of this Agreement, shall Provider bill, charge, collect a deposit from, seek compensation, remuneration or reimbursement from, or have any recourse against Members or persons other than Cooperative acting on their behalf for services provided pursuant to this Agreement. This provision shall not prohibit collection of charges for copayments, deductibles or services not covered under the terms of the Group Contract; shall survive the termination of this Agreement regardless of the cause giving rise to termination; shall be construed to be for the benefit of Members; and shall supersede any oral or written contrary agreement now existing or hereinafter entered into between Provider and Members or persons acting on their behalf.

(2) Provider shall not exercise its right, if any, under Wis. Stat. § 609.92, to elect to be exempt from Wis. Stat. § 609.91(1)(b). Provider understands that by agreeing not to make an election under Wis. Stat. § 609.92, Provider is obligated to abide by the provisions of this Agreement and Wis. Stat. 609.91(1) which protect Members from liability for the costs of Covered Services.

■
This contractual requirement, that the hospital hold harmless a patient to whom services are rendered when the patient is an HMO subscriber, unambiguously negates the existence of the Dorrs' obligation to

pay Sacred Heart. The hospital's sole recourse for payment for services rendered is from Group Health in accordance with the terms of the Provider Agreement. The hospital concedes these provisions preclude the existence of a debt for medical services the patient is obligated to pay. The act of filing the lien attaching the Dorrs' claim to the insurance settlement proceeds violates the hold harmless provision because Sacred Heart agreed not to seek recourse against Group Health's HMO subscribers. Pursuing the insurance proceeds is an attempt to seek recourse against the Dorrs because the claim to the proceeds belongs to the Dorrs. Therefore, we conclude that because the Provider Agreement negates the existence of a debt owed by the Dorrs to the hospital and because the filing of the lien violates the hospital's agreement to not seek recourse against Group Health's subscribers, the hospital is precluded under the contract from asserting its lien rights under § 779.80, STATS.

■

We conclude that the hospital is without legal authority to utilize § 779.80, STATS., to attach property of an injured HMO enrollee who is not subject to an underlying debt. The injured HMO enrollee has no underlying debt because according to the Provider Agreement and § 609.91, STATS., the HMO and not the injured patient is obligated to pay for the costs of medical services. The hospital acknowledges that no debt is created because of the application of § 609.91 and that therefore the Dorrs are not indebted to the hospital for the services rendered to Beverly. In addition, the Provider Agreement negates the existence of a debt owed by the Dorrs to the hospital. Therefore, the hospital is precluded from making any claim for payment against the Dorrs utilizing § 779.80.

## II. THE DORRS' APPEAL

Having determined that the hospital was without authority to utilize § 779.80, STATS., because no underlying debt exists, we now turn to each of the causes of action the Dorrs appeal.

### A. VIOLATION OF § 100.18, STATS.

The Dorrs assert that the hospital made false representations in violation of § 100.18, STATS. We agree. Section 100.18 prohibits deceptive, misleading, or untrue statements of any kind to the public made in a commercial setting, no matter how made. *State v. Automatic Merchandisers of Am., Inc.*, 64 Wis. 2d 659, 663–65, 221 N.W.2d 683, 686–87 (1974).

The Dorrs contend the hospital made fraudulent representations to the public in two ways. First, they contend that the hold harmless provision of the Provider Agreement, which was advertised to Group Health enrollees, was violated when the hospital attempted to collect for its services from the Dorrs' property. Sacred Heart represented that its bills would be satisfied in full by Group Health payments, and yet, Sacred Heart did not always accept Group Health payments but instead asserted liens against enrollees in violation of its representation that it would hold the patient harmless. Second, the Dorrs contend that the hospital represented to the public that it agreed to be bound by the immunity provision of § 609.91, STATS., and its contract with Group Health. When it sought to file a hospital lien against Beverly's liability settlement, the hospital violated its representation to be bound by § 609.91.

When conflicting inferences can be drawn, the determination whether the hospital's promise is decep-

tive, misleading or untrue, contrary to § 100.18, STATS., is a question of fact that must be determined by the trier of fact. *See W.R Milbrandt v. Huber*, 149 Wis. 2d 275, 291–92, 440 N.W.2d 807, 813 (Ct. App. 1989). We conclude that a reasonable jury could infer that advertising the hospital will hold a patient harmless implies that no attempt will be taken to collect against a patient's assets for services rendered. A jury could reasonably conclude that the hospital's contractual agreement to hold subscribers harmless from payment, with full knowledge that the plan is marketed and that the HMO advises its subscribers that they will be held harmless for hospital costs, may be a representation made to the public within the meaning of the statute. Therefore, a jury could reasonably find that the hospital's attempt to collect payment from assets the Dorrs were entitled to is a violation of its representation to hold subscribers harmless and therefore is a violation of § 100.18.

Furthermore, we agree with the Dorrs that the hospital's promise to be bound by the immunity provision of § 609.91, STATS., could be inferred to be a representation to all enrolled in Group Health medical insurance plans that they will incur no liability for hospitalization expenses covered under the HMO's policies. Again, a jury could find that the hospital's attempt to collect payment from assets to which the Dorrs were entitled violates its representation to be bound by § 609.91 and, therefore, violates § 100.18, STATS. The determination whether these representations are deceptive or misleading is a question of fact subject to competing inferences and is therefore inappropriate for summary judgment determination. *State Bank of La Crosse v. Elsen*, 128 Wis. 2d 508, 512, 383

N.W.2d 916, 918 (Ct. App. 1986). Because we conclude that the trial court erred when it dismissed the false representation claim, we reverse and remand for trial.

B. WISCONSIN CONSUMER ACT, CHAPTER 427, STATS.

The Dorrs next claim that the hospital violated § 427.104(1)(f) and (j), STATS., of the Wisconsin Consumer Act.[3] The trial court ultimately dismissed this claim concluding that the Act did not apply because the hospital's $27,051.65 bill exceeded the Act's $25,000 monetary cap under § 421.202, STATS. The court reasoned that, while the separate bills for the two hospitalizations were less than the statutory cap, the hospital could combine those bills because both hospitalizations were related to injuries sustained in the auto accident. Because the sum total exceeded the $25,000 cap, the court reasoned the Act did not apply. We do not agree.

The Act defines "transaction" as "an agreement between 2 or more persons, whether or not the agreement is a contract enforceable by action, and includes the making of and the performance pursuant to that

---

[3] Section 427.104(1)(f) and (j), STATS., provide:

(1) In attempting to collect an alleged debt arising from a consumer credit transaction or other consumer transaction, including a transaction primarily for an agricultural purpose, where there is an agreement to defer payment, a debt collector may not:

. . . .

(f) Disclose or threaten to disclose information concerning the existence of a debt known to be reasonably disputed by the customer without disclosing the fact that the customer disputes the debt;

. . . .

(j) Claim, or attempt or threaten to enforce a right with knowledge or reason to know that the right does not exist . . . .

agreement." Section 421.301(44), STATS. The Act defines "agreement" in the following manner: "Agreement means the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance." Section 421.301(3), STATS. While the total claim the hospital asserted exceeded the Act's statutory maximum, the total of the two claims cannot be used unless they arise from a single transaction as defined by the Act.

The Act looks to the existence of agreements between the claimed debtor and the claimed creditor. The trial court apparently concluded as a matter of law that the hospital was entitled to combine the claims for the two hospitalizations into a single claim exceeding the Act's statutory limit. The definition of "agreement" under the Act, however, does not support this conclusion. The evidence of the circumstances surrounding Beverly's two admissions is not before us and, consequently, we cannot determine whether these admissions are separate and discrete agreements or whether they may be combined. This evidence was not before the trial court, and therefore summary judgment should not have been granted.

The nature of the agreements reached between the Dorrs and the hospital, and whether the two hospitalizations represent a single transaction or separate transactions is a mixed question of fact and law. The evidence before the court was insufficient to determine whether the two hospitalizations represent a single transaction or are separate transactions. The trial court must permit the parties to more fully develop the record so that it can determine whether Beverly's admissions are separate agreements under the Act. If the Dorrs can demonstrate that the hospitalizations

are separate and independent transactions under the Act, each claim must be treated independently and both are under the statutory maximum. Because the statutory maximum is not exceeded if these are independent transactions, the Act would apply. Once the facts are determined, whether the facts fulfill a particular legal standard is a question of law. *Nottelson v. DILHR*, 94 Wis. 2d 106, 116, 287 N.W.2d 763, 768 (1980). When all the evidence as to the nature of the agreements between the hospital and the Dorrs has been received, the court may apply the Act's definitions and reach a conclusion as to whether the hospital may properly add the claims together.

We therefore conclude that the trial court prematurely granted summary judgment to the hospital dismissing the claimed violation of the Act. We reverse the trial court's judgment dismissing this claim and remand for further proceedings.

## C. THIRD-PARTY BENEFICIARY BREACH OF CONTRACT

The Dorrs allege that Sacred Heart breached a provision of the Provider Agreement between the hospital and Group Health, to which the Dorrs were third-party beneficiaries. The Dorrs seek damages resulting from the hospital's alleged breach.

While the general rule is that only a party to a contract may recover under it, there is an exception for a contract specifically made for the benefit of a third person. *Goosen v. Estate of Standaert*, 189 Wis. 2d 237, 249, 525 N.W.2d 314, 319 (Ct. App. 1994). The person claiming to be a third-party beneficiary must show that the parties to the contract entered into it directly and primarily for the benefit of the third party. *Id*. An indi-

rect benefit incidental to the contract is not sufficient. *Id.* The contract must indicate that the third-party either was specifically intended by the contracting parties to benefit from the contract, or is a member of a class the contracting parties intended to benefit. *Id.*

Section 7.05 of the Provider Agreement expressly addresses third-party beneficiaries, stating:

> *Third Party Beneficiaries.* Except as otherwise *specifically provided* herein, this Agreement shall not create or be construed to create any rights in any manner whatsoever in any other person or entity as a third party beneficiary. (Emphasis added.)

However, § 2.09 of the Provider Agreement states:

> *Hold Harmless.* (1) Payment by Cooperative under this Agreement shall constitute payment in full for Covered Services rendered to Members. In no event . . . shall provider bill, charge, collect a deposit from, seek compensation, remuneration or reimbursement from, or have any recourse against Members or persons other than Cooperative acting on their behalf for services provided pursuant to this Agreement. *This provision . . . shall be construed to be for the benefit of Members . . . .* (Emphasis added.)

We conclude that the clear and unambiguous terms of § 2.09 create a contractual obligation to hold subscribers harmless for payment for hospital services. The provision's terms are designed specifically for the purpose of protecting HMO subscribers. As such, the HMO subscribers are third-party beneficiaries of this contractual provision, a breach of which supports a third-party beneficiary breach of contract claim. *See Goosen*, 189 Wis. 2d at 249, 525 N.W.2d at 319. The agreement contains a third-party beneficiary provision

expressing a general intent not to create third-party beneficiary rights, but also identifies an exception for provisions in the contract that specifically create third-party beneficiary rights. Here, the hold harmless provision creates third-party beneficiary rights by stating that it shall be construed for the benefit of members. The right to be held harmless is of no benefit to Group Health because it is contractually obligated to pay on the agreed basis for the services the hospital rendered to its subscribers. It is of no benefit to Sacred Heart because the hospital is prohibited from seeking recourse against Group Health subscribers. The beneficiaries of this provision are Group Health subscribers. Accordingly, § 2.09 creates third-party beneficiary rights, which the Dorrs may enforce. Because the trial court's conclusion that the Dorrs were not third-party beneficiaries was error, we reverse its summary judgment dismissing this claim and remand for further proceedings on this claim.[4]

## D. RACKETEERING

Next, the Dorrs argue that the trial court erred when it dismissed their claim under Wisconsin's Racketeering statutes, §§ 946.82(4) and 946.83, STATS. The Dorrs assert that the hospital's filing of false liens is a violation of § 943.60, STATS., Wisconsin's criminal slander of title statute.[5] The trial court granted summary judgment dismissing this claim concluding that the evidence was insufficient to demonstrate that the hos-

---

[4] Because we affirm the trial court's award of contractual damages, it would appear any damages flowing from this claim have already been awarded.

[5] Section 943.60, STATS., is one of the enumerated felonies identified in § 946.82(4), STATS.'s definition of "racketeering activity."

pital acted with the necessary criminal intent at the time they filed the lien.

Section 943.60(1), STATS., states in pertinent part:

> Any person who submits for filing, entering or recording any lien, claim of lien . . . and who knows or should have known that the contents or any part of the contents of the instrument are false, a sham or frivolous, is guilty of a Class D felony.

One of the statute's elements is knowledge at the time of filing that the document's contents in whole or in part are false, sham or frivolous. *State v. Leist*, 141 Wis. 2d 34, 36, 414 N.W.2d 45, 46 (Ct. App. 1987). Because this is a question of fact, it is up to the jury to determine whether under all the circumstances the hospital knew its lien claim was false. *Id*.

We conclude that the record contains evidence sufficient to raise the inference that Sacred Heart acted with the requisite intent in filing the lien. The record contains evidence that Sacred Heart had filed similar liens against HMO subscribers who were injured in automobile accidents and that the hospital considered the practice of attempting to collect from a patient's personal injury settlement before accepting payment from the HMO as standard in the industry.[6] There is further evidence in the record that the hospital recognized both that the lien represented that the Dorrs owed the debt for hospital services and that the Dorrs were legally immune from collection and owed no debt

---

[6] The trial court found that Sacred Heart has filed similar liens on more than three occasions since January 1, 1990, thus satisfying the predicate pattern of racketeering activity under § 946.82(3), STATS., defining a pattern of racketeering activity as "engaging in at least 3 incidents of racketeering activity of the same or similar intents . . . ."

pursuant to both § 609.91, STATS., and the Provider Agreement. One hospital employee testified that by filing the lien, the hospital was claiming the insurance settlement as collateral in the event the Dorrs did not pay the bill and that if they wanted to own the settlement free and clear, the only way to remove the lien was to pay the bill even though the hospital recognized the Dorrs did not owe the bill. This record is sufficient to permit a jury to conclude that the hospital filed similar liens knowing that the content of the liens was false and thus infer the requisite state of mind for criminal slander of title and to apply Wisconsin's Racketeering statute to the hospital's conduct.

Summary judgment should not be granted when the resolution of a dispositive issue depends on state of mind. *Gouger v. Hardtke*, 167 Wis. 2d 504, 517, 482 N.W.2d 84, 90 (1992); *see also Lecus v. American Mut. Ins. Co.*, 81 Wis. 2d 183, 190, 260 N.W.2d 241, 244 (1977) (the issue of intent, generally, is not one that can properly be decided on a summary judgment motion). Therefore, we conclude it was error for the trial court to dismiss this claim on summary judgment, and we reverse and remand this claim for trial.

### E. PUNITIVE DAMAGES

Finally, the Dorrs contend the trial court erred when it dismissed their claim for punitive damages under Section 895.85(3), STATS., which provides:

> The plaintiff may receive punitive damages if evidence is submitted showing that the defendant acted maliciously toward the plaintiff or in an intentional disregard of the rights of the plaintiff.

Before the question of punitive damages in tort actions can properly be submitted to a jury, the circuit court must determine as a matter of law that the evidence will support an award of punitive damages. *Jacque v. Steenberg Homes, Inc.*, 209 Wis. 2d 605, 614, 563 N.W.2d 154, 158 (1997).

The trial court dismissed the Dorrs' claim for punitive damages stating:

> That the defendant, in relying upon the language of § 779.80 Wis. Stats., [hospital lien statute] has not demonstrated conduct which would warrant the imposition of punitive damages. Further, that while the Hospital was not authorized to file a Hospital Lien because of the statutory provisions and contract language previously cited, its action in doing so was not wilful, wanton, or egregious conduct which the Court, as a matter of law, would consider to be punitive in nature.

> That the Court makes similar findings regarding punitive damages of all three causes of action, conversion, tortious interference with contract, and unfair debt collection practices.

To determine whether as a matter of law the question of punitive damages should have been submitted to the jury, we review the record de novo. *Id.* A plaintiff's entitlement to punitive damages rests on proof of maliciousness or of an intentional disregard of plaintiff's rights. Section 895.85(3), STATS.

Upon our review of the record, we conclude that there is ample evidence to raise a jury question whether Sacred Heart acted with intentional disregard for the Dorrs' rights. Hospital employees acknowledged

that the Dorrs, as HMO enrollees, were immune from payment to the hospital under § 609.91, STATS., and the Provider Agreement. Nevertheless, pursuant to hospital policy, the hospital's first course of action when there is an accident is to collect the patient's claim from the tortfeasor's liability carrier rather than bill the patient's HMO. The record reflects that the Dorrs and their attorney requested that the hospital drop the lien, yet the hospital refused and would not submit its bill to Group Health for payment as agreed in the Provider Agreement. Hospital employees testified that the reason for filing the lien was to protect the hospital from nonpayment even though the hospital was assured payment from the HMO. The record also contains evidence the hospital filed liens despite a patient's HMO coverage because the hospital recognized it could collect more money from the liability carrier and that filing the lien was purely a ploy to try to get as much money as possible. Because there are sufficient credible facts to allow a jury to find that Sacred Heart acted with intentional disregard for the Dorrs' rights, we conclude the trial court erred when it dismissed the Dorrs' claim for punitive damages. We reverse and remand this claim for further proceedings to evaluate the nature of the hospital's conduct.

### III. SACRED HEART'S CROSS-APPEAL

We now turn to the causes of action which Sacred Heart cross-appeals.

### A. CONVERSION

The Dorrs claimed that the hospital's encumbrance of the insurance proceeds acted as a conversion of their rights to this money. The trial court awarded summary judgment to the Dorrs and the hospital cross-

appealed on this claim. The hospital agrees that the Dorrs may properly assert this claim if the hospital was without authority to utilize the hospital lien statute.

While initially questioning the nature of title and ownership to the property in question, the hospital now concedes that a conversion lies if, as we have decided, the hospital was without authority to encumber the insurance proceeds by utilizing the hospital lien statute. Therefore, we affirm the trial court's summary judgment in the Dorrs' favor on the conversion claim.

### B. TORTIOUS INTERFERENCE WITH CONTRACT BETWEEN DORRS AND GROUP HEALTH

The Dorrs assert that Sacred Heart tortiously interfered with their contract with Group Health. Under that health insurance contract, Group Health agreed to pay for all services the hospital provided to Beverly. The Dorrs claim that the hospital has precluded Group Health from fulfilling this contractual obligation by refusing to submit its bill to Group Health for payment. The trial court granted summary judgment in the Dorrs' favor, concluding that there were no disputed issues of material fact as to the elements of this claim. The hospital cross-appealed the judgment on this claim.

The elements of tortious interference with a contract are: (1) the plaintiff had a contract or prospective contractual relationship with a third party; (2) the defendant interfered with the relationship; (3) the interference was intentional; (4) a causal connection exists between the interference and the damages; and (5) the defendant was not justified or privileged to interfere. *Cudd v. Crownhart*, 122 Wis. 2d 656, 659–60, 364 N.W.2d 158, 160 (Ct. App. 1985). To have the req-

uisite intent, the defendant must act with a purpose to interfere with the contract. *Id.* Liability will only be found when the actor "knew that the interference was 'certain, or substantially certain, to occur.' " *Augustine v. Anti-Defamation League of B'nai B'rith*, 75 Wis. 2d 207, 220–21, 249 N.W.2d 547, 554 (1977) (quoted source omitted).

■■■

We conclude that the trial court properly found Sacred Heart liable for tortious interference with Group Health's contract to provide medical services to the Dorrs. It is undisputed that Group Health is contractually obligated to provide full benefit hospitalization and medical services to the Dorrs. Group Health cannot fulfill this obligation if Sacred Heart fails to send Group Health its bill. Sacred Heart concedes that it failed to submit its bill to Group Health, knowing that Group Health could not then fulfill its contractual responsibilities to the Dorrs, because it did not want the reduced per diem payment from Group Health. Instead, Sacred Heart sought to pursue a larger claim by filing the hospital lien for the full itemized costs of services provided. Furthermore, the record reflects that Sacred Heart refused to submit the bill to Group Health despite repeated requests by the Dorrs and Group Health that Sacred Heart bill the HMO and drop the lien.

Generally, intent is a factual issue for the trier of fact, and only when the facts are such that no other reasonable inference may be drawn may the trial court find intent or lack of intent as a matter of law. *Harman v. La Crosse Tribune*, 117 Wis. 2d 448, 457, 344 N.W.2d 536, 541 (Ct. App. 1983). We conclude, however, that the record supports the trial court's summary judgment in the Dorrs' favor. The hospital's course of

conduct is sufficient to satisfy the requisite intent as a matter of law because the hospital concedes it intentionally precluded Group Health from fulfilling its contractual obligation to pay the Dorrs' health care costs. The hospital's concession that it intentionally failed to bill Group Health preferring instead to file the hospital lien so it could recover the full itemized cost of services rendered, confesses the requisite purposeful intent to interfere with Dorrs' HMO contract. *See Crownhart*, 122 Wis. 2d at 659–60, 364 N.W.2d at 160. We therefore conclude that the trial court properly granted summary judgment in the Dorrs' favor and we affirm.

*By the Court.*—Judgment affirmed in part; reversed in part and cause remanded with directions.