# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 03-2061

ASSESSMENT TECHNOLOGIES OF WI, LLC,

*Plaintiff-Appellee,*

v.

WIREDATA, INC.,

*Defendant-Appellant.*

_____

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 01-C-789—**Aaron E. Goodstein**, *Magistrate Judge.*

_____

ARGUED NOVEMBER 3, 2003—DECIDED NOVEMBER 25, 2003

_____


Before POSNER, DIANE P. WOOD, and EVANS, *Circuit Judges.*

POSNER, *Circuit Judge.* This case is about the attempt of a copyright owner to use copyright law to block access to data that not only are neither copyrightable nor copyrighted, but were not created or obtained by the copyright owner. The owner is trying to secrete the data in its copyrighted program—a program the existence of which reduced the likelihood that the data would be retained in a form in which they would have been readily accessible. It would be appalling if such an attempt could succeed.

Assessment Technologies (AT, we'll call it) brought suit for copyright infringement and theft of trade secrets

against WIREdata, and the district court after an evidentiary hearing issued a permanent injunction on the basis of AT's copyright claim alone, without reaching the trade secret claim. A sample database in the demo version of AT's product—a version freely distributed for promotional purposes—reveals the entire structure of the database, thus making the trade secret claim incomprehensible to us. But we shall not make a formal ruling on the claim. It was not addressed either by the district court or by the parties in their submissions in this court, and conceivably if improbably it has more merit than we can find in it.

The copyright case seeks to block WIREdata from obtaining noncopyrighted data. AT claims that the data can't be extracted without infringement of its copyright. The copyright is of a compilation, and the general issue that the appeal presents is the right of the owner of such a copyright to prevent his customers (that is, the copyright licensees) from disclosing the compiled data even if the data are in the public domain.

WIREdata, owned by Multiple Listing Services, Inc., wants to obtain, for use by real estate brokers, data regarding specific properties—address, owner's name, the age of the property, its assessed valuation, the number and type of rooms, and so forth—from the southeastern Wisconsin municipalities in which the properties are located. The municipalities collect such data in order to assess the value of the properties for property-tax purposes. Ordinarily they're happy to provide the data to anyone who will pay the modest cost of copying the data onto a disk. Indeed, Wisconsin's "open records" law, Wis. Stat. §§ 19.31-.39; *State ex rel. Milwaukee Police Ass'n v. Jones*, 615 N.W.2d 190, 194-96 (Wis. App. 2000), which is applicable to data in digital form, see *id.* at 195-96; Wis. Stat. § 19.32(2), requires them to furnish such data to any person who will pay the copying

cost. However, three municipalities refused WIREdata's request. They (or the contractors who do the actual tax assessment for them) are licensees of AT. The open-records law contains an exception for copyrighted materials, *id.*, and these municipalities are afraid that furnishing WIREdata the requested data would violate the copyright. WIREdata has sued them in the state courts of Wisconsin in an attempt to force them to divulge the data, and those suits are pending. Alarmed by WIREdata's suits, AT brought the present suit to stop WIREdata from making such demands of the municipalities and seeking to enforce them by litigation.

The data that WIREdata wants are collected not by AT but by tax assessors hired by the municipalities. The assessors visit the property and by talking to the owner and poking around the property itself obtain the information that we mentioned in the preceding paragraph—the age of the property, the number of rooms, and so forth. AT has developed and copyrighted a computer program, called "Market Drive," for compiling these data. The assessor types into a computer the data that he has obtained from his visit to the property or from other sources of information and then the Market Drive program, in conjunction with a Microsoft database program (Microsoft Access), automatically allocates the data to 456 fields (that is, categories of information) grouped into 34 master categories known as tables. Several types of data relating to a property, each allocated to a different field, are grouped together in a table called "Income Valuations," others in a table called "Residential Buildings," and so on. The data collected by the various assessors and inputted in the manner just described are stored in an electronic file, the database. The municipality's tax officials can use various queries in Market Drive or Market Access to view the data in the file.

WIREdata's appeal gets off on the wrong foot, with the contention that Market Drive lacks sufficient originality to be copyrightable. Copyright law unlike patent law does not require substantial originality. *Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340, 345-48 (1991). In fact, it requires only enough originality to enable a work to be distinguished from similar works that are in the public domain, *Bucklew v. Hawkins, Ash, Baptie & Co.*, 329 F.3d 923, 929 (7th Cir. 2003); *Alfred Bell & Co. v. Catalda Fine Arts, Inc.*, 191 F.2d 99, 102-03 (2d Cir. 1951), since without some discernible distinction it would be impossible to determine whether a subsequent work was copying a copyrighted work or a public-domain work. This modest requirement is satisfied by Market Drive because no other real estate assessment program arranges the data collected by the assessor in these 456 fields grouped into these 34 categories, and because this structure is not so obvious or inevitable as to lack the minimal originality required, *Key Publications, Inc. v. Chinatown Today Publishing Enterprises, Inc.*, 945 F.2d 509, 513-14 (2d Cir. 1991), as it would if the compilation simply listed the data in alphabetical or numerical order. *Feist Publications, Inc. v. Rural Telephone Service Co.*, *supra*, 499 U.S. at 362-64. The obvious orderings, the lexical and the numeric, have long been in the public domain, and what is in the public domain cannot be appropriated by claiming copyright. Alternatively, if there is only one way in which to express an idea—for example, alphabetical order for the names in a phone book—then form and idea merge, and in that case since an idea cannot be copyrighted the copying of the form is not an infringement. *Ets-Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1082 (9th Cir. 2000); *Kregos v. Associated Press*, 937 F.2d 700, 705-07 (2d Cir. 1991). That is not the situation here.

So AT has a valid copyright; and if WIREdata said to itself, "Market Drive is a nifty way of sorting real estate data

and we want the municipalities to give us their data in the form in which it is organized in the database, that is, sorted into AT's 456 fields grouped into its 34 tables," and the municipalities obliged, they would be infringing AT's copyright because they are not licensed to make copies of Market Drive for distribution to others; and WIREdata would be a contributory infringer (subject to a qualification concerning the fair-use defense to copyright infringement, including contributory infringement, that we discuss later). But WIREdata doesn't want the Market Drive compilation. It isn't in the business of making tax assessments, which is the business for which Market Drive is designed. It only wants the raw data, the data the assessors inputted into Market Drive. Once it gets those data it will sort them in accordance with its own needs, which have to do with pro-viding the information about properties that is useful to real estate brokers as opposed to taxing authorities.

But how are the data to be extracted from the database without infringing the copyright? Or, what is not quite the same question, how can the data be separated from the tables and fields to which they are allocated by Market Drive? One possibility is to use tools in the Market Drive program itself to extract the data and place it in a separate electronic file; this can be done rapidly and easily with just a few keystrokes. But the municipalities may not have the program, because the inputting of the data, which did of course require its use, was done by assessors employed by firms to do this work as independent contractors of the municipalities. And if the municipalities do have the program, still their license from AT forbids them to dis-seminate the data collected by means of it—a restriction that may or may not be in violation of the state's open-records law, a question we come back to later. A second extraction possibility, which arises from the fact that the database is a

Microsoft file accessible by Microsoft Access, is to use Access to extract the data and place it in a new file, bypassing Market Drive. But there is again the scope of the license to be considered and also whether the method of extraction is so cumbersome that it would require more effort than the open-records law requires of the agencies subject to it. It might take a programmer a couple of days to extract the data using Microsoft Access, and the municipalities might lack the time, or for that matter the programmers, to do the extraction. But that should not be a big problem, because WIREdata can hire programmers to extract the data from the municipalities' computers at its own expense.

From the standpoint of copyright law all that matters is that the process of extracting the raw data from the database does not involve copying Market Drive, or creating, as AT mysteriously asserts, a derivative work; all that is sought is raw data, data created not by AT but by the assessors, data that are in the public domain. A derivative work is a translation or other transformation of an original work and must itself contain minimum originality for the same evidentiary reason that we noted in discussing the requirement that a copyrighted work be original. *Pickett v. Prince*, 207 F.3d 402, 405 (7th Cir. 2000); *Gracen v. Bradford Exchange*, 698 F.2d 300, 304-05 (7th Cir. 1983). A work that merely copies uncopyrighted material is wholly unoriginal and the making of such a work is therefore not an infringement of copyright. The municipalities would not be infringing Market Drive by extracting the raw data from the databases by either method that we discussed and handing those data over to WIREdata; and since there would thus be no direct infringement, neither would there be contributory infringement by WIREdata. It would be like a Westlaw licensee's copying the text of a federal judicial opinion that he found in the Westlaw opinion database and giving it to

someone else. Westlaw's compilation of federal judicial opinions is copyrighted and copyrightable because it involves discretionary judgments regarding selection and arrangement. But the opinions themselves are in the public domain (federal law forbids assertion of copyright in federal documents, 17 U.S.C. § 105), and so Westlaw cannot prevent its licensees from copying the opinions themselves as distinct from the aspects of the database that are copyrighted. See *Matthew Bender & Co. v. West Publishing Co.*, 158 F.3d 693 (2d Cir. 1998); *Matthew Bender & Co. v. West Publishing Co.*, 158 F.3d 674 (2d Cir. 1998).

AT would lose this copyright case even if the raw data were so entangled with Market Drive that they could not be extracted without making a copy of the program. The case would then be governed by *Sega Enterprises Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1520-28 (9th Cir. 1992). Sega manufactured a game console, which is a specialized computer, and copyrighted the console's operating system, including the source code. Accolade wanted to make computer games that would be compatible with Sega's console, and to that end it bought a Sega console and through reverse engineering reconstructed the source code, from which it would learn how to design its games so that they would activate the operating system. For technical reasons, Accolade had to make a copy of the source code in order to be able to obtain this information. It didn't want to sell the source code, produce a game-console operating system, or make any other use of the copyrighted code except to be able to sell a noninfringing product, namely a computer game. The court held that this "intermediate copying" of the operating system was a fair use, since the only effect of enjoining it would be to give Sega control over noninfringing products, namely Accolade's games. See also *Sony Computer Entertainment, Inc. v. Connectix Corp.*, 203 F.3d 596, 602-08 (9th Cir.

2000); *Bateman v. Mnemonics, Inc.*, 79 F.3d 1532, 1539-40 n. 18 (11th Cir. 1996); *Atari Games Corp. v. Nintendo of America, Inc.*, 975 F.2d 832, 842-44 (Fed. Cir. 1992). Similarly, if the only way WIREdata could obtain public-domain data about properties in southeastern Wisconsin would be by copying the data in the municipalities' databases as embedded in Market Drive, so that it would be copying the compilation and not just the compiled data only because the data and the format in which they were organized could not be disentangled, it would be privileged to make such a copy, and likewise the municipalities. For the only purpose of the copying would be to extract noncopyrighted material, and not to go into competition with AT by selling copies of Market Drive. We emphasize this point lest AT try to circumvent our decision by reconfiguring Market Drive in such a way that the municipalities would find it difficult or impossible to furnish the raw data to requesters such as WIREdata in any format other than that prescribed by Market Drive. If AT did that with that purpose it might be guilty of copyright misuse, of which more shortly.

AT argues that WIREdata doesn't need to obtain the data in digital form because they exist in analog form, namely in the handwritten notes of the assessors, notes that all agree are not covered by the Market Drive copyright. But we were told at argument without contradiction that some assessors no longer make handwritten notes to copy into a computer at a later time. Instead they take their laptop to the site and type the information in directly. So WIREdata could not possibly obtain all the data it wants (all of which data are in the public domain, we emphasize) from the handwritten notes. But what is more fundamental is that since AT has no ownership or other legal interest in the data collected by the assessor, it has no legal ground for making the acquisition of that data more costly for WIREdata. AT is trying to use its

copyright to sequester uncopyrightable data, presumably in the hope of extracting a license fee from WIREdata.

We are mindful of pressures, reflected in bills that have been pending in Congress for years, Jonathan Band & Makoto Kono, "The Database Protection Debate in the 106th Congress," 62 *Ohio St. L.J.* 869 (2001), to provide legal protection to the creators of databases, as Europe has already done. Jane C. Ginsburg, "Copyright, Common Law, and Sui Generis Protection of Databases in the United States and Abroad," 66 *U. Cinc. L. Rev.* 151 (1997). (Ironically, considering who owns WIREdata, the multiple-listing services are pressing for such protection. Ron Eckstein, "The Database Debate," *Legal Times*, Jan. 24, 2000, p. 16.) The creation of massive electronic databases can be extremely costly, yet if the database is readily searchable and the data themselves are not copyrightable (and we know from *Feist* that mere data are indeed not copyrightable) the creator may find it difficult or even impossible to recoup the expense of creating the database. Legal protection of databases as such (as distinct from programs for arranging the data, like Market Drive) cannot take the form of copyright, as the Supreme Court made clear in *Feist* when it held that the copyright clause of the Constitution does not authorize Congress to create copyright in mere data. But that is neither here nor there; what needs to be emphasized in this case is that the concerns (whether or not valid, as questioned in Ginsburg, *supra*, and also J.H. Reichman & Pamela Samuelson, "Intellectual Property Rights in Data?" 50 *Vand. L. Rev.* 51 (1997), and Stephen M. Maurer & Suzanne Scotchmer, "Database Protection: Is It Broken and Should We Fix It?" 284 *Sci.* 1129 (1999)) that actuate the legislative proposals for database protection have no relevance because AT is not the collector of the data that go into the database. All the data are collected and inputted by

the assessors; it is they, not AT, that do the footwork, the heavy lifting.

AT points to the terms of its license agreements with the municipalities, which though ambiguous might be interpreted to forbid the licensees to release the raw data, even without the duplication, or revelation of any copyrighted feature, of Market Drive. But AT is not suing for breach of the terms of the agreements—it can't, since WIREdata is not a party to them. Nor is it suing for intentional interference with contract, *Frandsen v. Jensen-Sundquist Agency, Inc.*, 802 F.2d 941, 947-48 (7th Cir. 1986) (Wisconsin law); *Dorr v. Sacred Heart Hospital*, 597 N.W.2d 462, 478 (Wis. App. 1999); *Cudd v. Crownhart*, 364 N.W.2d 158, 160-61 (Wis. App. 1985), which would be the logical route for complaining about WIREdata's inviting the municipalities that are AT's licensees to violate the terms of their license. The licenses do nothing for AT in this case.

So it is irrelevant that *ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447, 1453-55 (7th Cir. 1996), holds that a copyright owner can by contract limit copying beyond the right that a copyright confers. See also *Bowers v. Baystate Technologies, Inc.*, 320 F.3d 1317, 1323-26 (Fed. Cir. 2003). Like other property rights, a copyright is enforceable against persons with whom the owner has no contractual relations; so a property owner can eject a trespasser even though the trespasser had not contractually bound himself to refrain from entering the property. That is why AT is suing WIREdata for copyright infringement rather than for breach of contract. The scope of a copyright is given by federal law, but the scope of contractual protection is, at least prima facie, whatever the parties to the contract agreed to. The existence of contractual solutions to the problem of copying the contents of databases is one of the reasons that Professor

Ginsburg and others are skeptical about the need for legislative protection of databases. But our plaintiff did not create the database that it is seeking to sequester from WIREdata; or to be more precise, it created only an empty database, a bin that the tax assessors filled with the data. It created the compartments in the bin and the instructions for sorting the data to those compartments, but those were its only innovations and their protection by copyright law is complete. To try by contract or otherwise to prevent the municipalities from revealing *their own* data, especially when, as we have seen, the complete data are unavailable anywhere else, might constitute copyright misuse.

The doctrine of misuse "prevents copyright holders from leveraging their limited monopoly to allow them control of areas outside the monopoly." *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1026-27 (9th Cir. 2001); see *Alcatel USA, Inc. v. DGI Technologies, Inc.*, 166 F.3d 772, 792-95 (5th Cir. 1999); *Practice Management Information Corp. v. American Medical Ass'n*, 121 F.3d 516, 520-21 (1997), amended, 133 F.3d 1140 (9th Cir. 1998); *DSC Communications Corp. v. DGI Technologies, Inc.*, 81 F.3d 597, 601-02 (5th Cir. 1996); *Lasercomb America, Inc. v. Reynolds*, 911 F.2d 970, 976-79 (4th Cir. 1990). The data in the municipalities' tax-assessment databases are beyond the scope of AT's copyright. It is true that in *Reed-Union Corp. v. Turtle Wax, Inc.*, 77 F.3d 909, 913 (7th Cir. 1996), we left open the question whether copyright misuse, unless it rises to the level of an antitrust violation, is a defense to infringement; our earlier decision in *Saturday Evening Post Co. v. Rumbleseat Press, Inc.*, 816 F.2d 1191, 1200 (7th Cir. 1987), had intimated skepticism. No effort has been made by WIREdata to show that AT has market power merely by virtue of its having a copyright on one system for compiling valuation data for real estate tax assessment purposes. Cases such as *Lasercomb*, however, cut misuse free from antitrust,

pointing out that the cognate doctrine of patent misuse is not so limited, 911 F.3d at 977-78, though a difference is that patents tend to confer greater market power on their owners than copyrights do, since patents protect ideas and copyrights, as we have noted, do not. The argument for applying copyright misuse beyond the bounds of antitrust, besides the fact that confined to antitrust the doctrine would be redundant, is that for a copyright owner to use an infringement suit to obtain property protection, here in data, that copyright law clearly does not confer, hoping to force a settlement or even achieve an outright victory over an opponent that may lack the resources or the legal sophistication to resist effectively, is an abuse of process.

We need not run this hare to the ground; nor decide whether the licenses interpreted as AT would have us interpret them—as barring municipalities from disclosing noncopyrighted data—would violate the state's open-records law. Cf. *Antisdel v. City of Oak Creek Police & Fire Comm'n*, 600 N.W.2d 1, 3 (Wis. App. 1999); *Gordie Boucher Lincoln-Mercury Madison, Inc. v. J & H Landfill, Inc.*, 493 N.W.2d 375, 378 (Wis. App. 1992); *State ex rel. Sun Newspapers v. Westlake Board of Education*, 601 N.E.2d 173, 175 (Ohio App. 1991); but cf. *Pierce v. St. Vrain Valley School District*, 981 P.2d 600, 605-06 (Colo. 1999). WIREdata is not a licensee of AT, and AT is not suing to enforce any contract it might have with WIREdata. It therefore had no cause to drag the licenses before us. But since it did, we shall not conceal our profound skepticism concerning AT's interpretation. If accepted, it would forbid municipalities licensed by AT to share the data in their tax-assessment databases with each other even for the purpose of comparing or coordinating their assessment methods, though all the data they would be exchanging would be data that their assessors had collected and inputted into the databases. That seems an absurd result.

To summarize, there are at least four possible methods by which WIREdata can obtain the data it is seeking without infringing AT's copyright; which one is selected is for the municipality to decide in light of applicable trade-secret, open-records, and contract laws. The methods are: (1) the municipalities use Market Drive to extract the data and place it in an electronic file; (2) they use Microsoft Access to create an electronic file of the data; (3) they allow programmers furnished by WIREdata to use their computers to extract the data from their database—this is really just an alternative to WIREdata's paying the municipalities' cost of extraction, which the open-records law requires; (4) they copy the database file and give it to WIREdata to extract the data from.

The judgment is reversed with instructions to vacate the injunction and dismiss the copyright claim.

REVERSED AND REMANDED, WITH INSTRUCTIONS.


A true Copy:

     Teste:


_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*