**Henry LEUTWYLER and Talk to the Hand, Inc., Plaintiffs,**

v.

**ROYAL HASHEMITE COURT OF JORDAN, Rania Atalla, Suhad Fitiany, and Alia A. Toukan, Defendants.**

**No. 00 Civ. 5485(GEL).**

United States District Court, S.D. New York.

Nov. 15, 2001.

Amy J. Benjamin, Darby & Darby PC (Eric A. Prager, of counsel), New York City, for Henry Leutwyler and Talk To The Hand, Inc.

John S. Willems, White & Case LLP (Karen M. Asner and Sali A. Qaragholi, of counsel), New York City, for Royal Hashemite Court of Jordan, Rania Atalla, Suhad Fitiany and Alia A. Toukan.

*OPINION AND ORDER*

LYNCH, District Judge.

Plaintiff Henry Leutwyler and his corporation, Talk To The Hand, Inc. (collectively, "Leutwyler"), originally brought this action for copyright, breach of contract, and other claims against Queen Rania Al–Abdullah of the Hashemite Kingdom of Jordan, the Office of the Her Majesty the Queen of Jordan (a Jordanian governmental body) and three officials of the Office of the Queen. In prior orders, this Court dismissed all claims against Queen Rania, based on the United States Executive Branch's determination that Queen Rania is immune from suit as a head of state, dismissed all claims against the Office of Her Majesty the Queen, because that entity lacked juridical existence, and dismissed claims sounding in defamation, tortious interference with business relations, intentional infliction of emotional distress, and a declaratory judgment that a prior order of a Jordanian court lacked force and effect in the United States, for lack of subject matter jurisdiction under the Foreign Sovereign Immunities Act. 28 U.S.C. § 1602 *et seq. Leutwyler v. Office of Her Majesty,* 184 F.Supp.2d 277(S.D.N.Y.2001) ("*Leutwyler I*").

Following the dismissals recorded in *Leutwyler I,* the plaintiffs filed a Second Amended Complaint, reasserting the copyright and breach of contract claims over which the Court does have jurisdiction, and substituting the Royal Hashemite Court of Jordan, apparently the proper juridical entity, for the Office of the Queen. Defendants now move to dismiss most of the remaining claims on a variety of grounds, and to strike certain allegations from the complaint. The motions will be granted in part and denied in part.

*Factual Background*

The facts and prior history of the litigation are fully set in *Leutwyler I,* and will not be repeated here. Essentially, insofar as is relevant to the remaining claims, the present complaint alleges that in August 1999 defendant Fitiany, personal assistant to the Queen of Jordan, invited Leutwyler, a professional photographer based in New York, to come to Jordan to photograph the members of the Royal Family. He accepted and completed the assignment (waiving a fee for his services, but requiring payment for various expenses), and in October 1999 mailed the finished photos to defendant Toukan, the Queen's press secretary. In a letter accompanying the prints, Leutwyler informed Toukan that he would grant the Royal Family a limited license for their "personal use ... and all press rights for all print media throughout the Middle East." Otherwise, the letter further stated, Leutwyler would retain "usage rights." Neither Toukan nor any other employee of the Royal Court responded to Leutwyler's letter or to his follow-up inquiry.

In December 1999, the International Press Office ("IPO") of Jordan, which at that time was a sub-department within the Royal Court, published *The 2000 Jordan Diary* (the "*Jordan Diary*"). The *Jordan Diary,* which was marketed and distributed in various countries, including the United States, contains information about Jordan's history, political structure and geography. Two of Leutwyler's photos were published in the *Jordan Diary.*

The basic theory of the case is that by including the photos in the *Jordan Diary* and distributing it outside the Middle East, defendants infringed Leutwyler's copyright and breached the contract he claims was embodied by the offer in his October letter that was accepted by defendants' retention and use of the photos.

Although the IPO acknowledged Leutwyler's copyright interest in the photos by accompanying the photos with the legend "© Henry Leutwyler," Leutwyler alleges that the photos were "reproduced, distributed, and publicly displayed" by the Royal Court without his "authorization or prior knowledge." (Second Amended Complaint, ¶ 39.) He further alleges that one or more of the individual defendants contributorily infringed Leutwyler's copyrights by furnishing the photos to the IPO. (*Id.* ¶ 40.) [1]

*Discussion*

## I. Copyright Claims

### A. Infringement/License

Count I of the Second Amended Complaint alleges copyright infringement in violation of the Copyright Act of 1976, as amended, 17 U.S.C. §§ 101–1205.[2] Defendant moves to dismiss the claim, arguing that publication of the photographs in the *Jordan Diary* was within the license granted by Leutwyler, which granted to the Jordanian Royal Family "all press rights for all print media throughout the Middle East." Unfortunately, the meaning of this license is sufficiently ambiguous that it cannot be determined on the face of the documents whether the publication falls within the license.

■ It is axiomatic that a party cannot seek damages for violation of copyright

law if the use was authorized by the copyright owner. *Graham v. James*, 144 F.3d 229, 236 (2d Cir.1998).[3] However, a copyright owner may bring a claim for infringement against a licensee whose actions exceed the scope of the license. *Marshall v. New Kids on the Block Partnership*, 780 F.Supp. 1005, 1009 (S.D.N.Y.1991). The question thus reduces to an interpretation of the license that Leutwyler concedes was granted.

■ "Principles of contract law are generally applicable in the construction of copyright ... licenses and other transfers of rights." 3 *Nimmer on Copyright* § 10.08 (2001). As is generally the case with contracts, a court may interpret a contract as a matter of law, where the language of the document is unambiguous. *Bourne v. Walt Disney Co.*, 68 F.3d 621, 629 (2d Cir.1995). However, " '[w]here the language used is susceptible to differing interpretations, each of which may be said to be as reasonable as another,' then the interpretation of the contract becomes a question of fact for the jury and extrinsic evidence of the parties' intent properly is admissible." *Bourne*, 68 F.3d at 629, quoting *Seiden Assocs. v. ANC Holdings*, 959 F.2d 425, 428 (2d Cir.1992).

■ Defendants claim that the *Jordan Diary* clearly falls within the unambiguous meaning of "press rights for all print media throughout the Middle East." They

---

1. In an affidavit in connection with the sovereign immunity motion, defendant Atalla, the Queen's Chief of Staff, avers that "[n]either The Office [of the Queen] nor any its employees has a role in the publication of *The 2000 Jordan Diary* or any responsibilities with the IPO," (Atalla Aff. ¶ 13), but she does not specifically deny that any of the individual defendants provided photos to the IPO.

2. Count III alleges copyright infringement under international law, in violation of the Berne Convention for the Protection of Literary and Artistic Works. Leutwyler has with-

drawn that claim (Tr. of October 22, 2001 [hereinafter "Tr."] 16), which will accordingly be dismissed. *See Carell v. Shubert Org.*, 104 F.Supp.2d 236, 258–59 (S.D.N.Y.2000).

3. We need not determine whether New York or Jordanian law applies to the issues in question. It is conceded that the law of both jurisdictions is consistent on these basic issues. (Def.'s Mem. 6; Aff. of Thamer Odeidat. Sept. 17, 2001, ¶¶ 5–13.) For convenience, the Court cites to cases decided under New York law.

would read the terms as permitting the right to print ("press rights") the photographs in any "print medi[um]," which clearly covers a book, such as the *Jordan Diary*, that is published anywhere in the Middle East. Leutwyler objects, however, that other readings are possible, and were actually intended, contending that the license granted only the right to print the photographs in the press, which he argues is a term of art referring to newspapers and magazines, not to book publishers, and also that the distribution of the material outside the Middle East, regardless of the location of the publisher's headquarters, violates the license.

Some of Leutwyler's arguments are not sufficiently persuasive. There may indeed be some confusion over the difference between "press rights" (which were granted, at least in the Middle East, by the license) and "usage rights" (which Leutwyler expressly retained, at least outside the Middle East). But the term "print media" has been construed to include books, among other things, as well as newspapers and magazines. *See, e.g., Telecomm. Research & Action Center v. FCC*, 801 F.2d 501, 505 (D.C.Cir.1986). It is, thus, difficult to conclude that a license covering "press rights *for all print media*" covers only "the press" in the restricted sense of "newspapers and magazines . . . the fourth estate" (Tr. 10).

On the other hand, the geographical scope of the license is much less clear. Leutwyler argues that the mere fact that the *Jordan Diary* was published in Amman does not bring it within the scope of "press rights . . . throughout the Middle East," since the book was distributed into the United States, and indeed worldwide, via the Internet and otherwise. Since distribution of the copyrighted material is an exclusive right of the copyright owner, and the license did not authorize distribution anywhere but in the Middle East, Le-

utwyler persuasively argues that the sale of a book containing his photos beyond "the Middle East" is an unlicensed infringement of his copyright.

Testimony by the parties about what they understood the contract to mean, under these circumstances, may well be helpful. Moreover, since territorial restrictions on copyright licenses are common enough, *see, e.g., United States v. Chicago Tribune–New York News Syndicate*, 309 F.Supp. 1301, 1302 (S.D.N.Y.1970), testimony by those in the publishing and photography business about the common understanding of language used in granting territorial rights could assist in understanding the language of this license. At any rate, it cannot be said at this stage of the litigation that, solely based on the unambiguous language of the licensing document, the publication of Leutwyler's photos in the *Jordan Diary* as a matter of law fell within the license provided by the October 1999 letter.

Accordingly, the motion to dismiss Count I for failure to state a claim is denied.

### B. *Remedies*

■ Defendants also seek to dismiss aspects of Leutwyler's prayer for relief. On the theory that defendants' infringement was willful, the Second Amended Complaint seeks actual and punitive damages, or statutory damages and attorneys' fees, totaling $50 million. (¶¶ 75, F, G, H.) However, Leutwyler has withdrawn his claims for statutory damages and attorneys' fees (Tr. 23) in response to defendants' argument that those remedies are unavailable because the works in question were not registered prior to the alleged infringement. *See* 17 U.S.C. § 412. Leutwyler continues to press his demand for punitive damages, but authority and logic compel the conclusion that such damages are unavailable in a statutory copyright action.

The Second Circuit has clearly stated that "punitive damages are not available under the Copyright Act of 1976." *Oboler v. Goldin,* 714 F.2d 211, 213 (2d Cir.1983). This is also the view of the leading commentary. 4 Nimmer on Copyright, § 14.02[B] at 14–23–14–24 (2001). Leutwyler argues that this statement was merely dictum, because the issue on appeal in *Oboler* was whether the district court had properly directed a verdict on damages. (Pl.'s Letter Br. of 10/31/01 at 2 n. 2.) But if this is dictum, it is dictum of the most persuasive sort. In *Oboler,* the Court reviewed a directed verdict for plaintiff in a copyright case, upholding the judgment as to liability, but determining that a directed verdict on damages had been unjustified. The Court then went on to note that on remand, the plaintiff could elect either the entry of judgment for statutory damages, or a trial on actual damages. In the context of the latter remedy, the Court specifically directed that "If the action proceeds to a new trial, we note that punitive damages are not available under the Copyright Act of 1976." 714 F.2d at 212–13. The "dictum" in question was thus carefully considered, and amounted to a direction to the district court in *Oboler* as to how to proceed with the case. It would be rash indeed for another district court to disregard that direction on the theory that it was merely dictum.[4] The

rule of *Oboler* has never been questioned in subsequent opinions, and has indeed been cited with approval by the Court of Appeals, albeit also technically in dictum and in slightly softened form. *Davis v. The Gap, Inc.,* 246 F.3d 152, 172 (2001) ("As a general rule, punitive damages are not awarded in a statutory copyright infringement action"; dictum because case held that plaintiff failed to show wilfullness).

At any rate, whether or not the discussion in *Oboler* is binding, it is clearly correct. Whatever might have been the case under common law, the Copyright Act is designed to preempt common-law remedies, and to establish a uniform and comprehensive national system of copyright protection. 17 U.S.C. § 301; *see also Notes of Committee on the Judiciary,* H.R.Rep. No. 94–1476 at 129–31 (1976), U.S.Code Cong. & Admin.News 1976, at 5659, 5744–47. In setting out the remedies available under the Act, Congress provided that "an infringer of copyright is liable for either (1) the copyright owner's actual damages and any additional profits of the infringer, as provided by subsection (b); or (2) statutory damages, as provided by subsection (c)." 17 U.S.C. § 504(a). The language is clear, unambiguous, and exclusive: these are the alternatives available to a copyright plaintiff, and punitive damages are not provided by either of them. *See* 17 U.S.C. § 504(b), (c).[5]

---

4. *Oboler* also disposes of Leutwyler's argument that cases noting that punitive damages are replaced by statutory damages under § 504(c)(2) only preclude punitive damages where a plaintiff elects statutory damages, and have no effect where a plaintiff disavows statutory damages in favor of actual damages. (Pl.'s Letter Br. 1–2; Tr. 19–21.) The *Oboler* directive to the district court concerned the damages that would be available "[i]f the action proceeds to a new trial." The Court made clear in virtually the same breath that no new trial would be required if the plaintiff elected statutory damages. Accordingly, the

*Oboler* "dictum" specifically announces the unavailability of punitive damages where, as here, the plaintiff has renounced statutory damages and seeks only actual damages.

5. Leutwyler argues that this scheme fails to provide any special punitive deterrent to willful infringers in cases where the actual damages exceed even the enhanced statutory damages provided by § 504(c). (Def.'s Letter Br. 2–3.) Putting aside the fact that this hardly seems to describe the instant case, the argument is properly addressed to Congress. Since it would be perfectly rational for Congress to conclude that actual damages under

Accordingly, plaintiff's demand for punitive damages is dismissed.

## II. Breach of Contract Claims

In Count II, Leutwyler charges the Royal Court and the three individual defendants with breach of contract, on the theory that exceeding the license granted by the October 1999 letter breached an obligation agreed to by defendants when they accepted the photographs. The individual defendants move to dismiss this case as to them, arguing that the allegations of the complaint and the documents on which Leutwyler relies clearly demonstrate that they, as individuals, were not parties to any such contract.

██ It is fundamental to the very definition of contract that parties are only liable for breach of agreements that they have voluntarily undertaken. Courts have repeatedly rejected efforts to assert contract claims against parties who negotiated agreements as agents for disclosed principals. Such an agent "will not be personally bound unless there is clear and explicit evidence of the agents' intention to substitute or superadd his personal liability for, or to, that of his principal." *Mencher v. Weiss*, 306 N.Y. 1, 4, 114 N.E.2d 177 (1953). *See also Salzman Sign Co. v. Beck*, 10 N.Y.2d 63, 66–67, 217 N.Y.S.2d 55, 176 N.E.2d 74 (1961); *Lerner v. Amalgamated Clothing and Textile Workers Union*, 938 F.2d 2, 5 (2d Cir.1991); N.Y. Jur.2d *Agency* § 318.

██ The allegations of the complaint and the documents referenced in it make clear that the individual defendants did not contract with Leutwyler on their own behalf—if indeed they contracted at all.[6] The complaint identifies all three individual defendants as employees of the Royal Court (Second Amended Complaint ¶¶ 8–10), states that Leutwyler was first contacted to take photographs by "Queen Rania Al Abdullah" in July 1998 (*Id.* ¶ 13), and alleges that after negotiations were suspended due to the illness of King Hussein, defendant Fitiany contacted him again in August 1999 "on behalf of the Office of the Queen and Queen Rania" (*Id.* ¶ 16). After the photographs were taken and developed, Leutwyler sent them to defendant Toukan with a letter, describing the work prints enclosed as "intended for Their Majesties to review and select those preferred," and granting rights "for all of these images for the personal use of Their Majesties and all press rights for all print media throughout the Middle East." (*Id.* ¶ 18, Ex. B.) When he received no reply, Leutwyler wrote to Toukan again, to find out "what Their Majesties thought of the pictures and if any prints are desired." (*Id.* ¶ 20. Ex. C.)

Under these circumstances, it is inconceivable that either Leutwyler or the defendants Fitiany and Toukan thought that the latter were acting in their own capacity, or "clear[ly] and explicit[ly]" indicated their intention to be personally bound by any contract that might have been made between Leutwyler and their employer. *Mencher*, 306 N.Y. at 4, 114 N.E.2d 177. Neither the photos nor the licensed uses were intended for Toukan, the recipient of the letter, but rather were explicitly stated to be for "Their Majesties." Whatever

§ 504(b) are ordinarily an adequate remedy, and that the punitive aspects of § 504(c) are necessary only in cases where actual damages are insignificant, there is no basis for inferring that Congress meant anything other than what it wrote.

6. Defendants have denied that a contract was created, and it is clearly a factual question whether the retention of the photographs, under the circumstances described in the complaint, can properly be understood as manifesting an intention to agree to the terms stated in Leutwyler's letter, which were never expressly agreed to by any of the defendants.

lack of clarity may exist about whether the counterparty to Leutwyler's asserted contract was technically the Queen, the King and Queen, the Royal Court, or some other Jordanian entity (*see* Tr. 3), there is no question that Leutwyler knew that the individual defendants were acting on behalf of the Royal Court or Royal Family, and not in their personal capacities.[7]

The breach of contract claims must, therefore, be dismissed as to the individual defendants.

### III. *Motion to Strike*

Finally, defendants move to strike from the Second Amended Complaint certain allegations relating to the dismissed tort claims. The allegations in question are irrelevant to the copyright and contract claims that remain viable. Leutwyler did not respond to the motion and argued that because defendants disregarded an agreement or directive reached at a prior conference to defer consideration of such a motion, he should have an opportunity to brief the issue before the Court rules. Defendants agree that a briefing schedule for the motion to strike had not been set. (Tr. 35–36).

It is difficult to see what response can be made to the defendants' contention that the several pages of allegations (¶¶ 25–36, 44–63) that lay the factual basis for claims that have been dismissed, and that do not relate in any way to the formation of the alleged contract, or the defendants' alleged infringing use of the photographs in the *Jordan Diary*, are irrelevant to the remaining claims and prejudicial in that they allege other wrongful acts by defendants. Nevertheless, it is also difficult to see what difference it makes at this stage of the litigation whether the allegations remain or not. No discovery will be permitted on these matters, which have no bearing on the remaining claims, and the repetition in the Second Amended Complaint of allegations that have already been publicly filed and discussed in the Court's prior opinion can have no effect on the on-going litigation or on the defendants' reputations. To the extent this surplusage in the Complaint could be thought to affect the presentation of evidence at trial, the matter can be safely addressed at a later date.

Accordingly, defendants' motion to strike is denied at this juncture, without prejudice to the renewal of a motion to strike or to redact the complaint in connection with the trial of the matter.

### Conclusion

For the reasons stated, Count III of the Second Amended Complaint, and the demand for statutory damages and attorneys' fees, are dismissed on consent. Defendants' motion to dismiss is granted to the extent that Count II is dismissed as to the defendants Atalla, Fitiany and Toukan, and the demand for punitive damages is dismissed. In all other respects, the motion is denied. Defendants' motion to strike is denied without prejudice to its renewal at a later stage of the litigation.

It is further ordered that the parties should proceed with discovery on the remaining claims, and should submit to the Court for approval a case management plan, which shall provide for the completion of discovery no later than May 24, 2002.

SO ORDERED:

---

7. The Court also notes that Leutwyler does not allege any participation whatsoever by defendant Atalla in the negotiations, nor any act that could in any way constitute an agreement by her to any contract terms. Thus, the contract claim would have to be dismissed as to her in any event.