EVOLUTION, INC., Plaintiff,

v.

**SUNTRUST BANK, et al., Defendants.**

No. CIV.A. 01–2409–CM.

United States District Court,
D. Kansas.

May 12, 2004.

Order Denying Reconsideration
Sept. 23, 2004.

---

Gregory B. Hancks, Kansas City, MO, Lance Y. Kinzer, Michael R. Clarke, Schlagel, Damore & Gordon, L.L.C., Olathe, KS, Richard P. Jeffries, Kutak Rock LLP, Omaha, NE, for Plaintiff.

Bryan G. Harrison, Morris, Manning & Martin, Atlanta, GA, Russell S. Jones, Jr., Shughart Thomson & Kilroy, PC, Kansas City, MO, for Defendants.

### MEMORANDUM AND ORDER

MURGUIA, District Judge.

Plaintiff Evolution, Inc. ("Evolution") brought suit against defendants SunTrust Bank ("SunTrust"), Premium Assignment Corporation ("PAC"), and SunTrust Services Corporation ("STSC") asserting claims for copyright infringement, breach of contract, and misappropriation of trade secrets. Defendants countered suit on theories of breach of contract, negligent misrepresentation, and fraud. This matter is before the court on Defendants' Motion for Summary Judgment (Doc. 119).

## I. Factual Background

### A. Parties

SunTrust is a bank organized and existing under the laws of the State of Georgia.

SunTrust provides banking and banking-related services to businesses and consumers in Georgia and throughout the southeastern United States. SunTrust is a successor-in-interest to STSC.[1] SunTrust managed the installation of plaintiff's software at PAC and provided ongoing software support after installation.

PAC is a corporation organized and existing under the laws of the State of Florida. PAC is a wholly owned subsidiary of SunTrust. PAC provides various services to the insurance industry, including financing services for insurance premiums.

Evolution is a Kansas corporation engaged in the business of software development. The instant lawsuit arises out of alleged problems associated with software that plaintiff provided to defendant.

### B. License Agreements

Defendants SunTrust and PAC and plaintiff are parties to three initial agreements for plaintiff to provide software products and that defined the scope of defendants' use of those products.

- A License Agreement for Software Services (the "Software License") entered into by plaintiff, and defendants PAC and STSC on June 30, 1998, which was amended on March 31, 1999, and September 23, 2000. The March 1999 amendment substituted a license for a financial processing software package known as PF32 for a product known as PF2000.
- A Source License Agreement (the "Source License") for plaintiff's PF2000 software entered into by plaintiff and defendants PAC and STSC on July 1, 1998, which was amended on March 30, 1999, to apply to the PF32 software. The Source License gave defendants

STSC and PAC certain rights to access and use plaintiff's source code.

- A Data Door License Agreement (the "Data Door License") entered into by plaintiff and defendants PAC and STSC on September 10, 1998.

Defendants state that their intention for purchasing the Data Door software was to give defendants the ability to access data and create customized reports. Plaintiff contests that the Data Door software had these abilities.

### 1. Rights Granted Under the Software License

The Software License states the licensed software is "solely for customers['] own internal operations." The Software License initially provided for 39 perpetual full-user licenses and 20 screen-only user licenses.[2] On September 23, 2000, the parties amended the Software License to increase the number of user licenses to a total of 44 full-user licenses and 25 screen-only user licenses in anticipation of use by PAC salespeople in the field. In general, the Software License prohibits copies being made, "with the exception of copies which shall be made in machine readable form and used exclusively for Customer's internal use."

Plaintiff's software contained a locking program that limited the number of full users that could access the system. The purpose of the locking program was to prevent access to any full user after the number of full users accessing the software exceeded the license limit. Defendants installed plaintiff's software on a network where the software was used by more than 69 users (the total number of full and screen-only users provided by the

---

1. Defendants consider SunTrust and STSC as interchangeable entities for purposes of this matter.

2. The Software License defines a "user" as a "computer terminal that has access to the database."

Software License). Defendants contend that plaintiff was aware the software was installed on a network and used by more than 69 users. Plaintiff denies the allegation.

### 2. Rights Granted Under the Source License

The Source License granted a license for plaintiff's PF32 source code [3] for use on one computer system [4] at one location. The Source License provided defendants the right to "use the Licensed Software for its own administrative, accounting or management purposes." Sec 11.1. The Source License also gave defendants certain limited rights to modify the software. Section 13.3(1) of the Source License provides:

> The parties agree that the right to make modifications or enhancements to the Licensed Software shall be controlled as follows:
>
> 1. In the customary circumstance, licensee shall request the assistance of Evolution to modify the Licensed Software pursuant to Schedule SA hereunder, and pursuant to the terms, costs, and conditions as are fully set forth in said Schedule SA which is attached hereto and incorporated herein by reference, the parties agree and acknowledge that any and all enhancements or modifications to the Licensed Software shall remain the sole property of Evolution and shall be subject to all the terms and conditions of this Source License.... Furthermore, should licensee request the services of Evolution pursuant to this para-

graph, should Evolution not be capable of providing seasonable scheduling for such services, then in that event, licensee shall be permitted to make the requested changes to the Licensed Software pursuant to the conditions set forth in paragraph 13.3(2) hereunder except as that paragraph requires that such modifications or enhancements be diminimis in nature....

> 2. In the circumstance where licensee shall require diminimis changes to the Licensed Software, licensee shall be permitted to make such changes but shall thereafter be required to submit any such changes to Evolution.... A diminimis change shall be defined as follows: any change which requires minimal enhancement by licensee to correct bugs in the Licensed Software.

### 3. Rights Granted Under the Data Door License

Plaintiff's marketing materials represented that the Data Door product was an "open architecture that allows SQL access to premium finance data. You can design and build the interface or we can do it for you." Defendants assert, therefore, that the purpose of Data Door was to access data stored by PF32 and create customized reports. Plaintiff counters that its marketing materials do not specifically state that this is the purpose of Data Door, although plaintiff does not thereafter proffer any evidence of what functions its Data Door product was intended to perform. Instead plaintiff point to the language of

---

3. "Source code" refers to human-readable software code used by programmers to develop a software program. "Object code" is machine-readable code that is a series of 1s and 0s. Source code is converted into object code through a process called "compiling."

4. The Source License defines "computer system" as "one network node for multi-user operating systems, which through a common central processing unit, provides access to the Licensed Software from one or more common diskettes or hard disks, or a single user operating system."

the Data Door License: "Data Door provided SQL access to PF2000 and PF32."

The Data Door License provides that defendants are authorized to "use the Licensed Software for its own administrative, accounting or management purposes." Section 11 of the Data Door License also creates the following relevant restrictions on defendants' use of the Data Door software:

- "Licensee may not use the Licensed Software Source Code on more than one computer system (CPU)." 11.1
- "Licensee is strictly prohibited from transferring the Licensed Software to any other entity without the written consent of Evolution." 11.2
- "For backup and archive purposes only, licensee may make up to five copies of the Licensed Software." 11.3
- "Licensee is strictly prohibited from using the Licensed Software for any purpose other than financing insurance premiums."

### C. Defendants' Difficulties with the Use of Plaintiff's PF32 Software [5]

On September 10, 1998, plaintiff delivered its first version of PF32 to defendants STSC and PAC. The software was installed in a test environment and in a production environment. The software was installed on a network server, which by its nature allowed multiple users to access the software.

Plaintiff's PF32 software failed to operate, which plaintiff asserts is because addi-

tional components needed to be installed for the software to function. On September 15, 1998, defendants STSC and PAC received a new version of plaintiff's software. On September 24, 1998, defendants STSC and PAC received modifications to plaintiff's software. Defendants assert that they continued to have problems with plaintiff's software, which required them to replace the software on a nearly weekly basis, and that the software did not work when defendants attempted to introduce it for use in May 1999. Plaintiff, through affidavit in support of its motion, contends that it was able to resolve problems with its software, when given a reasonable amount of time, and that defendants complicated the problems with plaintiff's software by requesting additional modifications to the software.

Defendants STSC and PAC also assert that plaintiff's software would not work with plaintiff's Voice Control System ("VCS") provided to PAC. VCS is a phone interface module that allows a client to use its loan number to search and retrieve information about the status of a loan. Plaintiff counters that VCS worked during plaintiff's testing, and plaintiff points out that defendants used plaintiff's software packages for two years. Plaintiff further contends that defendants admitted that VCS worked with plaintiff's new version of its software, called the "$7 version," and that VCS worked with plaintiff's later-installed "$9 version" during plaintiff's testing.[6] Defendants concede that the $7 ver-

---

**5.** With respect to the factual allegations regarding defendants' difficulties with plaintiff's software, plaintiff, in several places, has denied defendants' assertion by citing to irrelevant evidence in the record. Rule 56(e) requires the nonmoving party to designate specific facts showing there is no genuine issue for trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. If no relevant, specific references is made, the court "will not search the record in an effort to determine whether

there exists dormant evidence which might require submission of the case to a jury." *Thomas v. Wichita Coca–Cola Bottling Co.*, 968 F.2d 1022, 1025 (10th Cir.1992).

**6.** The terms "$7 version" and "$9 version" refer to the number of digits before the decimal point that the program is capable of processing, i.e., $x,xxx,xxx.xx for the $7 version and $xxx,xxx,xxx.xx for the $9 version.

sion of the software worked with VCS, but assert that the $7 version caused numerous other problems. Further, defendants state, the $9 version of plaintiff's software did not work with VCS.

On November 15, 1998, several of defendants PAC and STSC's employees traveled to plaintiff's office. Defendants assert that the purpose of the visit was to demonstrate the pervasive problems encountered by STSC and PAC in attempting to implement plaintiff's software. Plaintiff contends by affidavit that the purpose of the meeting was to provide defendants' employees with training in the operation of plaintiff's software. During the visit, defendants' employees worked with plaintiff to correct numerous problems in the operation of plaintiff's software.

Defendants PAC and STSC learned that plaintiff was utilizing a different version of its software to support defendants than had been installed in the PAC/STSC test environment. Plaintiff's representative stated to defendants PAC and STSC that plaintiff made changes to the program and did not retain a copy of the software that was installed at PAC. Instead, plaintiff had one copy of the source code, which it changed from day to day without maintaining the copy in use by its customers. The result, defendants conclude, is that when plaintiff provided an update to fix a problem, STSC and PAC would receive the code they had not previously tested and that contained additional modifications that were completely unrelated to the problem defendants were trying to have resolved. Plaintiff contends that defendants were at fault for this confusion as they were obligated to use the latest version of plaintiff's software and install all updates. Plaintiff further asserts that, under the License Agreement, plaintiff was not obligated to support previous versions of its software.

From January 15 through May 27, 1999, plaintiff delivered to defendants STSC and PAC various fixes and upgrades for its PF32 software. On February 22, 1999, defendant STSC wrote to plaintiff expressing defendants STSC and PAC's concern over several programming issues and requested that plaintiff provide the source code for its software to defendants STSC and PAC according to the terms of the Source License. On March 25, 1999, representatives from PAC and STSC traveled to plaintiff's offices to discuss the issues relating to plaintiff's software and to obtain a copy of the source code for plaintiff's software. On March 30, 1999, defendants PAC and STSC and plaintiff amended the License Agreement and the Source License to reflect that defendants PAC and STSC had obtained rights to plaintiff's PF32 product, rather than the PF2000 product reflected in the agreements.

As a result of the need to apply numerous patches to plaintiff's software, defendants STSC and PAC delayed the date of final implementation until June 1, 1999. On that date, however, defendants STSC and PAC discovered another bug causing a further delay until June 6, 1999. From June 2–4, 1999, plaintiff sent defendants PAC and STSC another set of alterations necessary to implement plaintiff's software. On June 4, 1999, defendant PAC began utilizing plaintiff's software in PAC's business. Even though defendants STSC and PAC did not consider the computer system to be stable, they put the software into production because the year 2000 was approaching and their system was not Y2K compliant. Thereafter, between June 4 and June 30, defendants PAC and STSC received an additional four sets of repairs for plaintiff's software.

Due to their continuing problems with plaintiff's software, defendants STSC and PAC developed several "workarounds,"

which defendants define as finding unconventional ways to utilize plaintiff's software, despite its problems. The workarounds were intended to be temporary fixes, and defendants STSC and PAC believed that plaintiff would eventually correct the problems. Approximately 75 workarounds were developed, however, and due to the high number, only the most significant were adopted. Plaintiff responds that defendants' development of workarounds was a choice, and if defendants wanted plaintiff to fix the problems associated with the workarounds, then defendants should have fully disclosed those issues to plaintiff.

Use of plaintiff's software in the production environment revealed several errors in its operation. First, as a result of one of the modifications requested by defendants, the software would create multiple copies of bank drafts. Second, the software would not allow PAC to print a current invoice from a customer whose previous payment was late. Third, defendants STSC and PAC experienced several run-time errors with the software.

In July 1999, the parties discussed the possibility of plaintiff granting defendant PAC the right to access a certain password-protected feature contained within plaintiff's PF32 software to allow defendant PAC to fix data errors in the database created by plaintiff's software. On or about July 25, 1999, defendant PAC and plaintiff entered into a Release of Liability and Agreement to Indemnify, which released plaintiff from any liability arising out of defendant PAC's use of the feature. Thereafter, plaintiff provided defendant PAC with the password to access this feature.

Defendants assert that when plaintiff delivered fixes for the problems with its software, none of the fixes included other previously installed fixes and contained new errors in its code. As a result, defen-dants ran multiple versions the $7 version, although plaintiff contends that it specifically instructed defendants not to run multiple versions of the software.

On September 15, 1999, plaintiff delivered to defendants PAC and STSC a new version of its software, the $9 version. The $9 version should have contained all of the fixes previously provided to defendants PAC and STSC, as well as additional functionality. Defendants PAC and STSC tested the $9 version of plaintiff's software and found that the program contained old bugs, which had been remedied with fixes in the previous versions of the $7 software, and numerous new bugs, which simply made the software unusable. Also, as previously set forth, defendants contend that the $9 version was incompatible with the VCS system, a claim which plaintiff denies. As a result of the failure of the $9 version, defendants STSC and PAC decided to fix the bugs in plaintiff's software themselves.

Plaintiff sought to bill defendant PAC $15,000 for work performed in connection with plaintiff's $9 version of the software. When defendants PAC and STSC questioned plaintiff regarding the invoice, plaintiff claimed that a PAC employee had authorized the work.

In mid-October 1999, PAC discovered and reported to plaintiff an aging-related error in plaintiff's $7 software. On October 20, plaintiff provided defendants PAC and STSC with a new version of the software that purportedly corrected the error. However, the problem persisted in the new version, and, as a result, defendant STSC created a fix for this error, which defendant PAC implemented on November 4, 1999, and which plaintiff admits is not an enhancement, but a bug fix.

In Fall 1999, defendant PAC experienced problems with the performance of the Data Door software. Reports compiled from defendants' databases that ini-

tially took less than a minute to prepare and print were now taking between 10 and 15 minutes. Defendants assert that the cause of the Data Door failure was due to incorrect interface files, known as DDFs, which malfunctioned in defendants' software, ASDNorth. Plaintiff contends that ASDNorth was the cause of defendants' problems.

As a result of their difficulties, defendants PAC and STSC began to develop a new program, called MIDAS, to satisfy PAC's reporting needs. MIDAS was developed primarily to provide defendant PAC with the ability to generate a ledger print. Defendants utilized certain literal elements from plaintiff's PF32 source code in their development of MIDAS. Specifically, defendants STSC and PAC used "calls", which are low-level software programs that access data and bring it to another program. Defendants STSC and PAC developed higher-level programs using *combinations of plaintiff's calls* to retrieve the data from PAC's database, as opposed to writing individual calls to retrieve such data. In other words, the software developed using plaintiff's code was used to extract data and then print reports or insert that data into a Microsoft Access database.

Performing the extraction process also required the creation of additional DDF interface files because plaintiff's DDF files did not work properly. Further, defendants state that plaintiff provided them with the information necessary to create the new DDFs. In response to defendants' requests for information, plaintiff faxed information and instructed defendants STSC and PAC regarding the header information and data structure. Pat Horn, plaintiff's employee, also admits having conversations with Michael Baddoo, defendant PAC's employee, in which Horn discussed certain DDFs. Plaintiff nevertheless asserts that it did not authorize defendants to create DDFs.

From October through December 1999, the parties continued discussions regarding, among other things, plaintiff's outstanding invoice for $15,000 and the quality control issues with plaintiff's software as perceived by defendants PAC and STSC. On November 23, 1999, defendant PAC reported in detail to plaintiff the numerous errors being encountered in plaintiff's software. In this report, defendant PAC explained again the circumstances requiring it to use multiple versions of plaintiff's program to perform certain tasks.

Toward the end of 1999, the parties' relationship continued to deteriorate due to the ongoing problems with plaintiff's software and because plaintiff billed defendants STSC and PAC for "enhancements," which defendants contend they did not request, or that were supposed to be fixes to the software. For example, defendants continued to dispute being charged $15,000 for the $9 version of plaintiff's software, which defendants' claim was supposed to fix the problems in $7 version. In January 2000, defendant STSC instructed plaintiff on its desired procedures for obtaining STSC's prior approval for plaintiff's work, including obtaining written authorization for any work estimated to cost more than $300.

On March 8, 2000, defendant STSC wrote plaintiff to summarize six previously reported problems. Defendants STSC and PAC also requested a written quote to correct the problems so that PAC could operate with a single version of plaintiff's software. On March 9, plaintiff responded and claimed that, since defendants STSC and PAC could utilize multiple versions of plaintiff's program as a workaround to perform certain tasks, then the problem had been fixed. In the same response,

plaintiff also stated that defendants should not be running more than one version of the software. Plaintiff then asserted that the software version received in October 1999 contained all of the fixes, notwithstanding the errors reported by defendants in November, and stated that the newest version of plaintiff's program would have everything that has been modified or fixed since the beginning of the program.

On April 7, 2000, representatives from defendant STSC traveled again to plaintiff's location for a meeting regarding the continuing problems with plaintiff's software. During this meeting, plaintiff notified defendant STSC of a new and improved software product called Compete that plaintiff would be releasing. Plaintiff assured defendant STSC that this new version of its software product would remedy the problems with plaintiff's earlier versions and allow PAC to operate on a single version of plaintiff's software.

In April 2000, plaintiff delivered a new version of its software to defendant STSC for testing. The software introduced new errors, thus defendants STSC and PAC determined that they needed to fix the software. On July 18, defendant STSC sent to plaintiff an updated list of problems in the new version of the software.

At some point following defendant STSC's July 2000 notice to plaintiff, plaintiff claimed to have developed a newer version of the $9 version, but STSC and PAC indicated they were not interested in the product. Instead, by mid-September 2000, defendants STSC and PAC were working to stabilize the $7 version. In fixing and stabilizing the $7 version of PF32, defendants STSC and PAC made several changes to the PF32 source code. Defendants contend that none of those changes resulted in a change of functionali-

ty, but merely corrected bugs within the software were considered *de minimis* changes. On October 30, 2000, defendants STSC and PAC described the bug fixes in a memorandum to plaintiff.

Defendants STSC and PAC discontinued payment of the annual maintenance fees billed by plaintiff.[7] Defendants stopped payments because they were still using the $7 version, which was now very old and plaintiff was providing updates only for its $9 version, which defendants found incompatible. Furthermore, because plaintiff had only one version of the $7 source code, which differed from the version utilized by STSC and PAC, plaintiff could not adequately support $7.

On August 2, 2001, counsel for defendants PAC and STSC notified counsel for plaintiff that they had converted to another vendor in May 2001. In preparation for the move, defendants PAC and STSC assert they needed to extract PAC's data stored in plaintiff's software and convert the data for use in the new vendor's software. Three programs-ABCNotes, LNSNotes, and QTR.exe-were therefore written to perform the data extraction. The conversion process involved understanding certain "header" information in plaintiff's software, which identified how the data were stored. Defendants contend that Horn provided the contents of the headers in a facsimile following his conversation with Baddoo. Defendants also state that the contents of the headers were revealed when they created DDF files.

## II. Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a

---

7. Defendants assert they stopped payments in mid–2001, while plaintiff contends payments were stopped beginning in 2000.

matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* (citing *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Id.* at 670–71. In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* at 671 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505; *see Adler*, 144 F.3d at 671 n. 1 (concerning shifting burdens on summary judgment). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut," rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

## III. Analysis

### A. Copyright Violations

#### 1. Scope of Copyright Licenses

■ A copyright licensee's remedy against a licensor that violates the terms of the copyright license generally is a claim for breach of contract rather than copyright infringement. *Sun Microsys., Inc. v. Microsoft Corp.*, 188 F.3d 1115, 1121 (9th Cir.1999) (citing *Graham v. James*, 144 F.3d 229, 236 (2d Cir.1998)). However, if the licensee exceeds the *scope* of the copyright license, then the copyright owner may bring an action for copyright infringement. *Id.; see also* 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 10.15[A], at 10–116. A licensee violates the scope of a copyright license by exceeding the specific purpose for which the license was granted. *ITOFCA, Inc. v. MegaTrans Logistics, Inc.*, 322 F.3d 928, 940 (7th Cir.2003) (citing *Gilliam v. Am. Broad. Cos., Inc.*, 538 F.2d 14, 20 (2d Cir.1976)). The distinction between an act that violates a copyright license, thereby allowing an action in contract, and an action that exceeds the scope of a copyright license, thereby allowing an action for infringement, "raises issues that lie at the intersection of copyright and contract law, an area of law that is not yet well developed." *Sun Microsys.*, 188 F.3d at 1122.

The court's role for purposes of the present motion is to determine whether the licensee's alleged actions amount to a violation of the license terms, or whether the licensee's actions have strayed beyond the actual scope of the license.

 The scope or purpose of a copyright license should be determined through application of normal principles of contract law. *Kennedy v. Nat'l Juvenile Det. Ass'n,* 187 F.3d 690, 694 (7th Cir.1999) (citing 3 Nimmer, *Nimmer on Copyright* § 10.08). Therefore, as with a contract, the court may interpret a copyright license as a matter of law when the language of the license is unambiguous. *See Leutwyler v. Royal Hashemite Court of Jordan,* 184 F.Supp.2d 303, 306 (S.D.N.Y.2001); *Kennedy,* 187 F.3d at 694; *see, e.g., Allman v. Capricorn Records,* 42 Fed.Appx. 82, 84, 2002 WL 1579899 (9th Cir.2002). On the other hand, where the language of the license is open to multiple interpretations, then determination of the scope of the license becomes a question of fact for the jury and is not properly decided by the court on summary judgment. *See Leutwyler,* 184 F.Supp.2d at 306 (quoting *Bourne v. Walt Disney Co.,* 68 F.3d 621, 629 (2d Cir.1995)); *ITOFCA,* 322 F.3d at 940–41 (citing *Glovaroma, Inc. v. Maljack Prods., Inc.,* 71 F.Supp.2d. 846, 855–56 (N.D.Ill.1999)).

 In this case, the Source License and the Data Door License contain identical sections entitled "Scope of Authorized Use," which read as follows:

11.1 Licensee may use the Licensed Software for its own administrative, accounting and management purposes on a Computer System. Licensee may not use the Licensed Software Source Code on more than one computer system (CPU).

11.2 Licensee is strictly prohibited from transferring the Licensed Software to any other entity....

11.3 For backup and archival purposes only, licensee may make up to five copies of the Licensed Software....

11.4 Licensee is strictly prohibited from using the License Software ... with more than one company entity or to process work for any third party....

11.5 Licensee is strictly prohibited from using the licensed software for any purpose other than financing insurance premiums.

11.6 Licensee is strictly prohibited from using the Licensed Software except as permitted in Part 1, paragraph 1. [The definition section of the license agreements.]

Plaintiff alleges that defendants exceeded the scope of the copyright licenses by using the PF32 source code and Data Door documentation to create the MIDAS, QTR. exe, ABCNotes, and LNSNotes software programs. Defendants argue that their use of plaintiff's software was permitted under section 11.1 of the licenses because defendants' use of the source code was for their "own administrative, accounting and management purposes."

Defendants argue that plaintiff's copyright infringement claim must be dismissed because defendants did not exceed the scope of the copyright licenses. However, the court concludes that section 11, and in particular 11.1, cannot be considered unambiguous. In other words, the court cannot conclude, as a matter of law, the definite scope of the copyright licenses. Consequently, the court also cannot determine, as a matter of law, whether defendants' alleged actions amount to a breach of the parties' contract, or whether defendants' alleged actions strayed beyond the actual scope of the license, allowing a claim for copyright infringement. Therefore, defendants' motion to enter summary judgment on plaintiff's copyright infringement claims on the basis that they are

actually breach of contract claims is denied.

## 2. Defendants' Use of Plaintiff's PF32 Source Code to Create QTR.exe, ABCNotes, and LNSNotes

■ Defendants contend their use of plaintiff's source code to create QTR.exe, ABCNotes, and LNSNotes cannot be considered copyright infringement because it was "fair use" of plaintiff's work, as provided by 17 U.S.C. § 107 of the 1976 Copyright Act. Neither courts nor the statute provide a benchmark definition of the concept of fair use, rather the doctrine is an equitable rule of reason that allows the use of copyrighted materials in limited circumstances. Section 107 does provide that:

> In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—
>
> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107; *see also Schmidt v. Holy Cross Cemetery, Inc.*, 840 F.Supp. 829, 834 (D.Kan.1993).

Section 107 is not meant to provide an exclusive list of factors that define fair use. Rather, the fair use doctrine " 'permits [and requires] courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster.' " *Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569, 577, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994) (quoting *Stewart v. Abend*, 495 U.S. 207, 236, 110 S.Ct. 1750, 109 L.Ed.2d 184 (1990)). Consequently, the fair use doctrine cannot be "simplified with bright-line rules," and instead "calls for case-by-case analysis." *Id.* (citing *Harper & Row Publishers, Inc. v. Nation Enter.*, 471 U.S. 539, 560, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985); *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 448 & n. 31, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984)).

The Ninth Circuit addressed the fair use doctrine in the context of copying computer source code in *Sega Enterprises Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1520–28 (9th Cir.1992).[8] Sega manufactured a video game console in which the operating system and source code were copyrighted. Accolade made a copy of the source code so that it could reverse engineer the code and discover how to make Accolade-manufactured games compatible with Sega's game console. The "functional requirements for compatibility" with Sega's game console were not protected by copyright, but Accolade had to copy and then disassemble Sega's copyrighted source code in order to get access to these non-copyrighted features. The court concluded that reverse engineering of Sega's source code was the only way to get to the non-copyright protected elements, and, therefore, the intermediate step of copying the source code and then the eventual disassembly of the source code was fair use as a matter of law. *See also Sony Computer Entm't, Inc. v. Connectix Corp.*, 203 F.3d

---

8. The Ninth Circuit first adapted the fair use doctrine to computer source code in *Atari Games Corp. v. Nintendo of America, Inc.*, 975 F.2d 832 (Fed.Cir.1992). The *Atari* defendants, however, obtained the plaintiff's source code wrongfully by making a false statement to the Copyright Office. This court, therefore, finds the Ninth Circuit's holding in *Sega* more factually applicable to the case at hand.

596, 602–08 (9th Cir.2000) ("We conclude that, under the facts of this case and our precedent, Connectix's intermediate copying and use of Sony's copyrighted BIOS was a fair use for the purpose of gaining access to the unprotected elements of Sony's software."); *Bateman v. Mnemonics, Inc.,* 79 F.3d 1532, 1540 n. 18 (11th Cir.1996) (adopting the *Sega* court's application of the fair use doctrine to reverse engineering activities that seek to gain access to nonprotectable ideas and functional elements).

Even more factually analogous to the case at hand is the Seventh Circuit's decision in *Assessment Technologies. of Wisconsin, LLC v. WIREdata, Inc.,* 350 F.3d 640, 645 (7th Cir.2003). WIREdata wanted access to real estate data that southern Wisconsin municipalities had collected but compiled in Assessment Technologies' ("AT") copyrighted computer program, Market Drive. AT brought suit to stop WIREdata from making the information requests of the municipalities, arguing that access to the Market Drive database would infringe on AT's copyright. Again, as in *Sega,* WIREdata wanted access to noncopyrightable data that was embedded within AT's copyrighted computer program. Citing *Sega,* the Seventh Circuit held that even

> if the only way WIREdata could obtain public-domain data about properties in southeastern Wisconsin would be by copying the data in the municipalities' databases as embedded in Market Drive, so that it would be copying the compilation and not just the compiled data only because the data and the format in which they were organized could not be disentangled, it would be privileged to make such a copy, and likewise the municipalities. For the only purpose of the

copying would be to extract noncopyrighted material, and not to go into competition with AT by selling copies of Market Drive.

*Id.* at 645.

■ The court finds persuasive the Ninth Circuit's holding in *Sega,* and, in particular, the Seventh Circuit's application of *Sega* in *WIREdata.* In the present case, defendants copied portions of plaintiff's source code in order to write the QTR.exe, ABCNotes, and LNSNotes computer programs, which extracted defendants' own data from plaintiff's program. Defendants' situation is factually similar to that described by the *WIREdata* court, in that the present defendants wished to access and extract uncopyrightable data that was embedded in a copyrighted computer program. Such use of plaintiff's source code falls well within the fair use doctrine as several federal circuit courts have articulated it.

Moreover, the court finds that application of the first, third, and fourth fair use factors identified in 17 U.S.C. § 107 supports defendants' actions. Defendants did not copy plaintiff's source code for their own commercial use; defendants did not copy plaintiff's entire source code; and, defendants' actions will have no effect on the potential market for plaintiff's source code as defendants are not a competitor with plaintiff, nor did they copy the source code in order to provide it to one of plaintiff's competitors. The court therefore concludes that, as a matter of law, defendants' copying of plaintiff's source code in order to write the QTR.exe, ABCNotes, and LNSNotes computer programs constituted fair use and was not a violation of plaintiff's copyright. Consequently, the court grants defendants' motion for summary judgment.

### 3. Defendants' Use of Plaintiff's PF32 Source Code to Create MIDAS

Defendants created the MIDAS computer program to create data reports by utilizing elements of plaintiff's PF32 source code. Defendants first argue that their use of the PF32 source code did not infringe on plaintiff's copyright because there were no restrictions in the Source License or Data Door License on defendants' use of plaintiff's software so long as the use was limited to internal purposes. The court addressed this argument above and concluded that it could not determine the scope of the licenses as a matter of law and, therefore, summary judgment is inappropriate.

Defendants' next argue that they made "fair use" of PF32 in the development of MIDAS. Defendants assert that, as with the other programs scripted with portions of plaintiff's source code, they created MIDAS with borrowed features of PF32 in order to extract their data from plaintiff's software.

The court concludes that its fair use analysis above also supports defendants' motion for summary judgment on the creation of MIDAS. Defendants did not create MIDAS for their own commercial use or to compete with plaintiff. Further, defendants did not copy plaintiff's entire source code in creating MIDAS, and, defendants' actions will have no effect on the potential market for plaintiff's source code. Therefore, the court finds that defendants created MIDAS by fair use of plaintiff's source code and grants defendants' motion for summary judgment.

■ Finally, even if the court did not grant defendants' motion for summary judgment on the basis of fair use, defendants would be entitled to summary judgment under the statutorily provided "adaptation" exception. Section 117 of the Copyright Act provides:

> (a) Making of additional copy or adaptation by owner of copy.—
> Notwithstanding the provisions of section 106 [ (outlining the exclusive rights in copyrighted works) ], it is not an infringement for the owner of a copy of a computer program to make or authorize the making of another copy or adaptation of that computer program provided:
>> (1) that such a new copy or adaptation is created as an essential step in the utilization of the computer program in conjunction with a machine and that it is used in no other manner
>> . . . .

17 U.S.C. § 117.

This district already has examined the application of Section 117 under a similar factual basis in *Foresight Resources Corporation v. Pfortmiller, et al.,* 719 F.Supp. 1006 (D.Kan.1989). Third party Hall–Kimbrell owned a copy of Foresight Resources Corporation's ("Foresight") copyrighted computer program, *Draftix 1 +.* Pfortmiller created a new product for Hall–Kimbrell, called the HK Digitizer, by enhancing *Draftix 1 +* with some additional lines of "text strings." Nevertheless, approximately 90% of the text strings between the HK Digitizer and *Draftix 1 +* remained the same. Judge Earl E. O'Connor concluded that the HK Digitizer was an "adaptation" of *Draftix 1 +* under Section 117 and, therefore, did not constitute a copyright violation.

The court finds convincing Judge O'Connor's opinion in *Pfortmiller* and applies his holding to the present case. Defendants created MIDAS from elements of plaintiff's PF32 source code in order to enhance the functionality of plaintiff's software. Defendants did not develop MIDAS for commercial benefit, but rather to add desired features to plaintiff's software. The court concludes that defendants' creation of MIDAS was a permissible adaptation of plaintiff's software under Section 117.

#### 4. Modifications of DDF Files

##### (1) Internal Use

Defendants first contend that their changes to DDF files did not infringe on plaintiff's copyright because defendants used the altered DDF files for internal use, which was authorized by the license agreement.

The Data Door License governs plaintiff's copyright in its DDF files. (*See* Data Door License, ¶ 1). The court already determined, above, that the language in section 11.1 of the Data Door License is too ambiguous for the court to grant summary judgment as a matter of law.

##### (2) Section 13.3(1)

■ Defendants contend that section 13.3(1) of the Data Door License authorized their actions, which permits defendants to modify the software if plaintiff was incapable of "providing seasonable scheduling for such services." Defendants then assert that the chronology of events surrounding the DDF files provides undisputed proof that plaintiff failed to provide such services in a timely manner, thus allowing defendants to modify the files themselves.

The court is not in a position to decide this issue as a matter of law. The meaning of "seasonable scheduling" is vague and ambiguous, and resolution of the sequence of events related to the DDF files is a question of fact. Therefore, the court denies defendants' motion to the extent it is based on this issue.

##### (3) Section 13.3(2)

■ Defendants argue that section 13.3(2) of the license agreements authorized them to make changes to the PF32 source code that are *de minimis,* defined as minimal enhancements to correct bugs in the licensed software. Plaintiff contests

this assertion by stating that any authority that existed to alter the PF32 source code did not extend to modifications of the DDF files.

However, section 1 of the Data Door License makes clear that the DDF files are included within the term "licensed software." The Data Door License then goes on, in section 13.3(2), to allow defendants to make *de minimis* changes in the licensed software as necessary to fix bugs in the software's operation. The evidence in the record clearly demonstrates that defendants modified the DDF files because the original files would not function properly. Indeed, plaintiff does not dispute that defendants altered the original DDF files in order to correct bugs in the software's operation. The court therefore concludes that because defendants' modifications, as a matter of law, fell within the scope of the Data Door License, the court grants defendants' motion for summary judgment on this issue.

##### (4) Section 117

Even if the court had not granted defendants' motion on the basis of the Data Door License, defendants' actions would have been permitted under 17 U.S.C. § 117. As the court discussed above, Section 117 permits a licensee to modify licensed software in order to enhance its functionality or make it usable to the licensee. Defendants modified the DDF files because the original files did not function properly. Therefore, the court concludes that defendants' alterations to the DDF files fall under the Section 117 exception and, consequently, do not constitute a copyright violation.

#### B. Breach of Contract

##### 1. Authorized Number of Users of Plaintiff's PF32 Software

Plaintiff alleges that defendants violated the License Agreement by exceeding the

number of users accessing plaintiff's software. Section 1.1 of the License Agreement states that plaintiff granted "thirty-nine (39) perpetual full user licenses and twenty perpetual (20) service screen only user licenses." [9] A user is defined, in section 1.1, as "each computer terminal which has access to the database."

Defendants first contend that plaintiff's software contained a locking program that limited the number of users accessing the system, which prevented defendants from exceeding the limits of the user license. According to defendants, the License Agreement does not limit the number of terminals on which the software is installed, but instead limited the number of terminals that may access the software at any one time.

█ Without actually denying plaintiff's allegation, defendants seem to argue that it was factually impossible for them to have exceeded the user limits set forth in the License Agreement. However, a plain reading of the License Agreement does not unequivocally support defendants' assertion that the limitation referred to the number of users accessing the software at the same time. Rather, the License Agreement more generally defines a user as each terminal that has access to the database. The court concludes, therefore, that defendants' interpretation of the License Agreement is a factual dispute that must be decided by a jury.

Defendants next assert that plaintiff has waived its right to bring this claim because it was aware that defendants installed the software on a network used by more than the permitted number of users and that the locking software was the only feature preventing defendants from exceeding the agreement.

Defendants appear to be arguing that, even though they contractually agreed to a limited number of user licenses, plaintiff had the responsibility of stopping defendants from violating their promise through the use of the locking software. Suffice it to say that the court is unpersuaded by defendants' argument. In any case, plaintiff states that it did not know that defendants were exceeding, or were planning to exceed, the user limit. The issue is therefore a disputed fact for a jury to decide.

## 2. Annual Fees

█ Section 2.2 of the License Agreement states that defendants must pay license fees to plaintiff for updates of plaintiff's software. Defendants argue that they were not obligated to pay annual fees because they did not use or install plaintiff's updates for approximately the last two years.

Plaintiff asserts that defendants were compelled to pay annual fees by section 2.2 in conjunction with section 2.1, which states that defendants must install plaintiff's updates.

The entire history of the parties' disputes about the alleged defects in plaintiff's software contains numerous factual disputes. Resolution of the issue of whether defendants were obligated to pay annual fees would require the court to rule upon controverted facts. Consequently, defendants' motion for summary judgment cannot be decided as a matter of law. Rather, this issue must be decided by a jury.

## 3. Modifications of Plaintiff's Software

█ Plaintiff alleges that defendants breached the parties' contract by modifying plaintiff's source code, in violation of both the Source License and Data Door License.

9. The parties later amended the License Agreement to provide for 69 user licenses.

Defendants contend that their modification of plaintiff's source code is permitted under 17 U.S.C. § 117, which provides that a licensee does not violate a copyright by making an adaptation of licensed software when the adaptation is necessary to utilize the software. At issue in this instance, however, is the interaction between the Copyright Act and state law, in this case a breach of contract claim.

Section 301 of the Copyright Act provides that if: " (1) the work is within the scope of the "subject matter of copyright" as specified in 17 U.S.C. §§ 102 and 103; and (2) the rights granted under the state law are equivalent to any exclusive rights within the scope of federal copyright as set out in 17 U.S.C. § 106." *Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 9 F.3d 823, 847 (10th Cir.1993) (quoting *Ehat v. Tanner*, 780 F.2d 876, 878 (10th Cir.1985)). There is no dispute that plaintiff's software falls within the subject matter of copyright as provided by 17 U.S.C. §§ 102 and 103.

Section 106 grants to the copyright owner the exclusive rights to reproduce the copyrighted work and prepare derivative works, among other rights. 17 U.S.C. § 106. Federal copyright law will preempt plaintiff's state law breach of contract claim unless plaintiff's claim requires an "extra element" beyond the rights provided by § 106. *Gates Rubber*, 9 F.3d at 847 (citing *G.S. Rasmussen & Assocs. v. Kalitta Flying Serv., Inc.*, 958 F.2d 896, 904 (9th Cir.1992)); *see also Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 456 (6th Cir.2001) (holding that the Copyright Act preempts a state-law claim unless the "extra element changes the nature of the action so that it is qualitatively different from a copyright infringement claim.").

Based upon the Pretrial Order and plaintiff's briefing, plaintiff's breach of contract claim for modification of its software does not assert any "extra element" beyond the rights protected by § 106. Further, plaintiff's breach of contract claim is not "qualitatively different from a copyright infringement claim." *See Wrench*, 256 F.3d at 456. Consequently, the court concludes that the Copyright Act preempts plaintiff's breach of contract claim for defendants' alleged modifications of plaintiff's software. Because the court already has determined that defendants' modifications were permitted under § 117, the court grants defendants' summary judgment motion on plaintiff's breach of contract claim on this issue.

### 4. Number of Servers on Which Plaintiff's Software Could be Installed

Plaintiff contends that defendants were authorized to install plaintiff's PF32 software on a production server and a test server, but that defendants violated section 1.1 of the License Agreement by installing plaintiff's PF32 software on multiple servers. Section 1.1 grants to defendants "single site ('single site' defined as the location where the production database resides)" user licenses.[10]

Defendants do not contest the factual allegation but, instead, argue that section 1.1 does not contractually limit the number of servers on which they could install plaintiff's software. According to defendants, "the limit is to the location where the production database resides, without any restriction regarding loading on multiple servers on that site." (Df. Rply. at 40).

---

**10.** Section 1.1 does not provide for installation of the software on a test server, but defendants assert that the software was installed on the test server with plaintiff's knowledge. Plaintiff does not contest this allegation and does not make a claim that installation on the test server violated the License Agreement.

Defendants appear to define "site" as a "place" where multiple servers exist, but without further description, the court is unable to construe what the term means. The court's assumption is that site would be synonymous with server, such that the software would be installed on a single server. Defendants' definition requires more explanation than is provided within the License Agreement, and, therefore, the court concludes that the issue is factually contested and cannot be decided as a matter of law.

### 5. Use of PF32 Source Code and Data Door Documentation to Build New Programs to Extract Defendants' Data

Plaintiff also brings a breach of contract claim for defendants' use of PF32 source code and data door documentation to create programs to extract defendants' data from plaintiff's software. Reviewing the Pretrial Order and plaintiff's briefing, the court finds that plaintiff's breach of contract claim does not differ qualitatively from the same claim brought under the Copyright Act. Therefore, based upon the court's analysis above, plaintiff's breach of contract claim is preempted by plaintiff's claim for copyright infringement, which already has been dismissed.

### C. Trade Secrets

### 1. Elements of Claim

Plaintiff claims that defendants misappropriated plaintiff's trade secrets when defendants created their data-extraction programs using plaintiff's PF32 source code and Data Door documentation.

The Kansas Trade Secrets Act, Kansas Statutes Annotated § 60–3320, *et seq.*, prohibits the misappropriation of trade secrets. A "trade secret"

> means information, including a formula, pattern, compilation, program, device, method, technique, or process, that:

> (i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and

> (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Kan. Stat. Ann. § 60–3320(4).

Misappropriation means:

> (i) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

> (ii) disclosure or use of a trade secret of another without express or implied consent by a person who

> (A) used improper means to acquire knowledge of the trade secret; or

> (B) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was

> (I) derived from or through a person who had utilized improper means to acquire it;

> (II) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

> (III) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

> (C) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

*Id.* § 60–3320(2).

### (1) Trade Secret

Plaintiff must demonstrate that its PF32 source code and Data Door documentation meet the definition of a trade secret. *MomsWin, LLC v. Lutes,* No. Civ.A. 02–

2195–KHV, 2003 WL 21554944, at *6 (D.Kan. July 8, 2003). Defendants assert that plaintiff has made only a general statement of the substance and character of its trade secrets and therefore failed to identify its trade secrets with the specificity required by Kansas law. In response, plaintiff has filed a sealed document, Exhibit N, which describes with more detail the trade secrets contained in plaintiff's PF32 source code and Data Door documentation.

Upon review of Exhibit N, the court finds that plaintiff has sufficiently described its trade secrets for purposes of § 60–3320(4).

### (2) Misappropriation

■■■■ Defendants next argue that plaintiff has offered no evidence demonstrating the misappropriation element of a trade secret violation.

There are various ways in which a defendant can misappropriate a trade secret. Plaintiff offers only a minimal response to defendants' motion, but it appears that plaintiff contends that defendants violated the Trade Secrets Act by "use of a trade secret of . . . [plaintiff] without express or implied consent by a person who . . . used improper means to acquire knowledge of the trade secret." Kan. Stat. Ann. § 60–3320(2)(ii)(A). Defendants contend that they did not "use" plaintiff's trade secrets in violation of the Trade Secrets Act because they did not use plaintiff's source code or documentation in order to enter into competition with plaintiff. Defendants cite the case of *Applied Information Management, Inc. v. Icart,* 976 F.Supp. 149, 156 (E.D.N.Y.19997), in which the court held that misappropriation of a trade secret by use occurs only when the defendant uses the trade secret in competition with the owner.

The *Icart* court applied New York law in reaching its holding. And while Kansas has enacted a uniform Trade Secrets Act similar to New York's, there does not appear to be an equivalent statement regarding the requirement of competition from a Kansas court. The court, therefore, relies on a plain reading of the statutory definition of misappropriation, which does not state that the use of a trade secret must be for personal benefit or competition against the trade secret's owner.

### (3) Improper Means

■■■ Defendants also assert that plaintiff has not established that defendants used "improper means to acquire knowledge." Improper means is defined to include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." Kan. Stat. Ann. § 60–3320(1).

Plaintiff has not responded to defendants' argument, leaving the court to determine whether the evidentiary record supports plaintiff's claim. To be consistent with plaintiff's earlier claims, the court assumes that plaintiff alleges that the improper means employed by defendants was acquiring knowledge of plaintiff's PF32 source code through reverse engineering. However, from the court's investigation, nearly every court that has considered the issue of reverse engineering has held that it does not by itself constitute an improper means for purposes of a trade secret violation. *See, e.g., Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,* 489 U.S. 141, 155, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989); *Chicago Lock Co. v. Fanberg,* 676 F.2d 400, 404 (9th Cir.1982); *Rockwell Graphic Sys. v. DEV Indus.,* 925 F.2d 174, 178 (7th Cir.1991).

The court finds persuasive these courts' conclusions that reverse engineering is not an improper means to discover trade secrets. Section 60–3320(1) describes a vari-

ety of means by which a trade secret is illicitly obtained through a violation of trust or outright theft. Discovering the guarded aspects of a product by disassembling the pieces to understand how they operate does not fall into the same class of activities prohibited by § 60–3320(1). Further, plaintiff offers no evidence that defendants used improper means to obtain access to the Data Door documentation, and the court cannot discern any such evidence from a review of the record. The court therefore grants defendants' motion for summary judgment on plaintiff's Trade Secrets Act claims on the grounds that plaintiff has not offered any evidence that defendants acted by improper means.

### 2. Preemption

 Defendants also contend that plaintiff's Trade Secrets Act claims are preempted by the Copyright Act.

Federal copyright law will preempt plaintiff's state law Trade Secret Acts claims unless plaintiff's claim requires an "extra element" beyond the rights provided by § 106 of the Copyright Act. *See Gates Rubber,* 9 F.3d at 847–48. In *Gates Rubber,* the Tenth Circuit held that the Copyright Act did not preempt a claim under the Colorado Uniform Trade Secrets Act because there was a an extra element of breach of a duty of trust in plaintiff's claim. *Id.* In this case, however, plaintiff's Trade Secrets Act claim is not distinguishable in any qualitative way from plaintiff's copyright infringement claim. That is, plaintiff's Trade Secrets Act claim does not allege an extra element. Thus, plaintiff's Trade Secrets Act claim is preempted by the Copyright Act.

### D. Defendants' Breach of Contract Counter Claims

Defendants also summarily move the court to enter summary judgment in their breach of contract counter claims against plaintiff. Defendants allege that plaintiffs violated the parties' contract by (1) failing to deliver a product that performed in accordance with the obligations set forth in the parties' agreements; (2) failing to support its product in accordance with industry standards; and (3) failing to deliver a usable product.

The court concludes that defendants' brief argument is inadequate to address the complexities raised in their counter claims; thus, the court denies defendants' motion.

### III. Order

**IS THEREFORE ORDERED** Defendants' Motion for Summary Judgment (Doc. 119) is granted in part and denied in part. The court grants Defendants' Motion for Summary Judgment in its entirety, with the exception of plaintiff's breach of contract claims based on defendants exceeding the licensed number of users, failing to pay annual fees, and installing multiple copies of plaintiff's software. The court also denies Defendants' Motion for Summary Judgment on defendants' breach of contract counter claims.

### MEMORANDUM AND ORDER DENYING RECONSIDERATION

On May 12, 2004, this court granted in part and denied in part Defendants' Motion for Summary Judgment. The matter now before the court is plaintiff's Motion for New Trial; Amendment of Judgment (Doc. 199).

### I. Standard

 Plaintiff filed its Motion for New Trial; Amendment of Judgment within ten days of this court's May 12, 2004 Order. Accordingly, the court will construe plaintiff's motion as a motion to alter or amend judgment under Rule 59(e). *Venable v. Haislip,* 721 F.2d 297, 299 (10th Cir.1983); Fed.R.Civ.P. 59(e). A Rule 59(e) motion

to alter or amend judgment is essentially a motion for reconsideration. *Henry v. Office of Thrift Supervision,* 1993 WL 545195, at *1 (D.Kan. Dec. 28, 1993) (citing *Hilst v. Bowen,* 874 F.2d 725, 726 (10th Cir.1989)), *aff'd,* 43 F.3d 507 (10th Cir. 1994).

, Motions for reconsideration under Rule 59(e) must either clearly establish a manifest error of law or present newly discovered evidence. *Phelps v. Hamilton,* 122 F.3d 1309, 1324 (10th Cir. 1997). Moreover, a party cannot invoke Rule 59(e) to raise arguments or present evidence that should have been set forth in the first instance or to rehash arguments previously considered and rejected by the court. *Federated Mut. Ins. Co. v. Botkin Grain Co.,* 856 F.Supp. 607, 609 (D.Kan. 1994). Whether to grant or deny a Rule 59(e) motion is within the district court's sound discretion. *Phelps,* 122 F.3d at 1324.

## II. Analysis

Plaintiff requests reconsideration for each of its claims dismissed on summary judgment. For all but one of these claims, however, plaintiff raises new arguments not previously raised in its response to defendants' motion for summary judgment. The purpose of Rule 59(e) motions is "reconsideration, not initial consideration. Thus, parties should not use them to raise arguments which could, and should, have been made before judgment issued." *United States ex rel. Noyes v. Kimberly Constr., Inc.,* 43 Fed.Appx. 283, 2002 WL 1722139 (10th Cir.2002) (citing *Jorge Rivera Surillo & Co. v. Falconer Glass Indus.,* 37 F.3d 25, 29 (1st Cir.1994) (internal quotation marks omitted)). Plaintiff has not argued that it was somehow precluded from originally articulating these arguments. In addition, plaintiff did not present any newly discovered evidence, nor did it establish a manifest error of law.

Plaintiff's motion for reconsideration makes one argument previously raised but not directly addressed in the court's decision. Plaintiff argues that the court's decision in granting defendants' motion for summary judgment on the issue of fair use of copyrighted software was in error because the decision was based on the court's incorrect assumption that defendants acquired plaintiff's source code by reverse engineering. More specifically, plaintiff argues that defendants never asserted that it obtained plaintiff's source code using reverse engineering. Upon a thorough review of the summary judgment briefs, the court acknowledges this to be the case. The court's opinion, however, did not refer to defendants' use of reverse engineering in its analysis. Further, the court's decision relied most heavily on *Assessment Tech. of WI, LLC v. WIREdata, Inc.,* 350 F.3d 640, 645 (7th Cir.2003), the facts of which did not involve reverse engineering. Therefore, while plaintiff's arguments regarding this issue are not new, they nevertheless fail to clearly establish a manifest error of law. Accordingly, the court hereby denies plaintiff's motion for reconsideration.

**IT IS THEREFORE ORDERED** Plaintiff's Motion for Reconsideration (Doc. 199) is denied.